## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AURORA OIL & GAS CORPORATION, | ) | Bankruptcy Case No.:  09-08254 (SWD) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| HUDSON PIPELINE & PROCESSING CO., LLC, | ) | Bankruptcy Case No.:  09-08255  (SWD) |
| | ) | |
| Debtor. | ) | |

## AFFIDAVIT OF CHIEF FINANCIAL OFFICER
## IN SUPPORT OF DEBTORS' FIRST-DAY MOTIONS

| | |
|---|---|
| STATE OF MICHIGAN | ) |
| | ) ss.: |
| COUNTY OF GRAND TRAVERSE | ) |

I, Barbara E. Lawson, being duly sworn, deposes and says:

1.      My name is Barbara E. Lawson, and I am over 21 years of age.  I am of sound mind and, if called to testify, I will attest to the facts described herein.  Except as otherwise noted, I have personal knowledge of the facts set forth in this affidavit (this "Affidavit").

2.      I am the Chief Financial Officer of Aurora Oil & Gas Corporation ("Aurora").  As such, I am familiar with the day-to-day operations, business, and financial affairs of each of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), and I submit this Affidavit on their behalf and in support of certain of the First-Day Motions (as defined below).  The information set forth herein is based upon my knowledge, information, and belief acquired since I began working at Aurora in 2004.

3.    On July 12, 2009 (the "Petition Date"), the Debtors each filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.  No trustee, examiner, or official committee has been appointed in these cases.

4.    I have reviewed the bankruptcy petitions filed by the Debtors, as well as the attachments thereto, and to the extent necessary and required, I declare under penalty of perjury that the information set forth therein is materially true and correct to the best of my knowledge, information, and belief.

<u>The Debtors and Their Businesses</u>

5.    The Debtors, along with certain non-debtor affiliates,[1] operate an independent energy business focused on the exploration and development of natural gas reserves, and they own and operate other businesses that provide supplemental services.

6.    The Debtors own extensive leasehold positions in the Antrim and New Albany shale regions of Michigan, Indiana, and Kentucky, targeting unconventional natural gas projects.  They operate primarily in Michigan, and they also participate in various other projects with joint venture partners, which operate property interests under "joint operating," "farm out," or similar agreements or arrangements, whereby the Debtors receive a percentage of revenue generated from those properties, rather than extracting and selling the natural gas themselves. The Debtors' corporate headquarters are located in Traverse City, Michigan.

7.    Aurora Oil & Gas Corporation, a Utah Corporation, is the Debtors' main

---

[1]    These following direct or indirect subsidiaries of Aurora are not Debtors in these cases: Aurora Indiana, LLC; Aurora Kentucky, LLC; AOG Michigan, LLC; Aurora Operating, LLC; Celebration Mining Company; Circle Oil, LLC; and Indiana Royalty Trustory, LLC.

operating company. Until its recent voluntary delisting, Aurora's outstanding common stock was publicly traded on the American Stock Exchange as "AOG".

8. Aurora owns approximately 96% of the outstanding membership interests in debtor Hudson Pipeline & Processing, Co., LLC ("HPPC"), and it is HPPC's controlling member. HPPC, a Michigan limited liability company, provides natural gas transportation and processing services to the Debtors.

9. The Debtors have 18 full-time employees and one part-time employee.

Capital Structure

10. On or about August 20, 2007, Aurora entered into an amended and restated credit agreement (as amended and/or modified from time to time, the "First Lien Loan Agreement")[2] with lenders BNP Paribas; Comerica Bank; KeyBank National Association; and CIT Capital USA Inc. (collectively, the "First Lien Lenders"). Obligations under the First Lien Loan Agreement are secured by senior, first-priority liens upon certain of the Debtors' assets (the "Collateral"). As of the Petition Date, approximately $70 million (plus accrued and unpaid interest and other asserted charges) is outstanding under the First Lien Loan Agreement.

11. At the same time, Aurora entered into a second lien term loan agreement (as amended and modified from time to time, the "Second Lien Loan Agreement")[3] with lenders D.E. Shaw Laminar Portfolios, L.L.C.; BNP Paribas; CIT Capital USA, Inc.; and Energy Components SPC UP-and Midstream Segregated Portfolio (collectively, the "Second Lien Lenders" and together with the Senior Secured Lenders, the "Lenders"). Obligations under the

---

[2]     A true and correct copy of the First Lien Loan Agreement is attached as Exhibit A to the Cash Collateral Motion (as defined below).

[3]     A true and correct copy of the Second Lien Loan Agreement is attached as Exhibit B to the Cash Collateral Motion.

Second Lien Loan Agreement are secured by second-priority liens upon the Collateral and are also guaranteed by HPPC.  As of the Petition Date, approximately $50 million (plus accrued and unpaid interest) is outstanding under the Second Lien Loan Agreement.

12.     On May 1, 2009, the Debtors and each of the Lenders entered into a Forbearance and Tolling Agreement (as amended on June 12, 2009, the "Forbearance and Tolling Agreement"), whereby the Lenders agreed to forbear from enforcement action with respect to certain events of default and to toll the 90-day avoidance window set forth in Bankruptcy Code § 547 with respect to certain additional collateral granted to the First Lien Lenders in accordance with an earlier amendment to the First Lien Loan Agreement.

13.     On or about September 19, 2005, Aurora entered into a promissory note with Northwestern Bank ("NW Bank"), as secured by a mortgage on Aurora's corporate headquarters in Traverse City (as amended, the "NW Bank Mortgage").  As of the Petition Date, the balance on the NW Bank Mortgage is approximately $2.6 million.

14.     In addition, NW Bank has issued approximately $633,000 in principal amount of letters of credit (collectively, the "NW Bank LCs") that are required for the Debtors' operations in Michigan.  The NW Bank LCs are secured by approximately $160,000 in cash collateral currently in one of Aurora's bank accounts with NW Bank and a pledge of the Debtors' right to receive approximately $500,000.

Circumstances Leading to this Filing

15.     As a result of, among other things, the reduced demand for, and the deflated price of, natural gas, and the initiation of cost-saving measures that temporarily hindered production and increased overhead, the Debtors have failed to satisfy certain production and financial covenants under the First Lien Loan Agreement and the Second Lien Loan Agreement.

16.     The Debtors have worked diligently to facilitate a global restructuring transaction, including entering into several amendments and forbearance agreements with the Lenders.   The Debtors have not yet been able to obtain agreement on the terms of such a restructuring and intend to utilize the bankruptcy process to attempt to achieve a consensual restructuring or some other appropriate alternative.

Filing of First-Day Motions

17.     I understand that the Debtors filed the following motions and applications (collectively, the "First-Day Motions"), some of which seek fairly routine administrative or emergency relief, on the Petition Date:[4]

(a)     Debtors' *Ex Parte* Motion for Emergency Hearing Regarding Motions Filed in Connection with Commencement of Chapter 11 Cases;

(b)     Debtors' Motion for Joint Administration;

(c)     Debtors' Motion for Authority to Limit Notice and to Establish Notice Procedures;

(d)     Debtors' Motion to Establish Case and Hearing Procedures;

(e)     Debtors' Motion for (I) Waiver of Requirement to File Matrix or List of Creditors, (II) Approval of Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases, and (III) Waiver of the Requirements to File Equity List and Provide Notice to Equity Security Holders;

(f)     Debtors' Motion to Extend Time to File Schedules and Statements;

(g)     Debtors' Motion for Order Transferring Holding Court for Hearings to Grand Rapids;

(h)     Debtors' Application to Retain Donlin, Recano & Company, Inc. as Claims, Notice, and Balloting Agent;

(i)     Debtors' Motion for Order (I) Authorizing Continued Use of

---

[4]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First-Day Motions.

Existing Bank Accounts, Cash Management Systems, and Checks and Business Forms and (II) Granting Waiver of Bond Requirement;

(j) Debtors' Motion to Establish Procedures for (I) Settlement of Terminated Forward Contracts and (II) Determination of Whether Certain Contracts Constitute Forward Contracts and/or Whether Such Forward Contracts Have Been Validly Terminated;

(k) Debtors' Motion for Order Establishing Notification and Hearing Procedures for Trading in Equity Securities;

(l) Debtors' Motion for Order (I) Authorizing Them to Pay Pre-Petition Wages and Salaries and to Pay and Honor Pre-Petition Employee Benefits and Related Obligations and (II) Scheduling Final Hearing on Related Relief;

(m) Debtors' Motion for Authority to Pay Pre-Petition Real and Personal Property Taxes;

(n) Debtors' Motion for Order Authorizing Payment of Rent, Royalties, and Related Amounts to Lessors and Taxing Authorities;

(o) Debtors' Motion for Authority to Pay Pre-Petition Claims of (I) Critical Vendors Providing Services for Operated Properties and (II) Operators of Other Properties;

(p) Debtors' Motion for Order (I) Establishing Deadline and Procedures for Filing Proofs of Claim and (II) Approving Form and Manner of Notice Thereof;

(q) Motion for Entry of Agreed Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Replacement Liens, Adequate Protection, and Administrative Expense Priority to Lenders, and (III) Scheduling Final Hearing (the "Cash Collateral Motion");

(r) Debtors' Motion for Order (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment;

(s) Debtors' Application to Employ and to Retain Cahill Gordon & Reindel LLP as Bankruptcy and Restructuring Counsel;

(t) Debtors' Application to Employ Warner Norcross & Judd LLP as Co-Counsel;

(u)     Debtors' Motion for Order Authorizing Entry Into Agreement with Huron Consulting Services LLC, Retention of Chief Restructuring Officer, and Assumption of Such Agreement;

(v)     Debtors' Application to Employ and Retain Beachwalk Capital LLC;

(w)     Debtors' Motion for Authority to Employ and Retain Professionals Used in the Ordinary Course of Business; and

(x)     Debtors' Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals.

Debtors' *Ex Parte* Motion for Emergency
Hearing Regarding Motions Filed in Connection
<u>with Commencement of Chapter 11 Cases</u>

18.     The Debtors have requested the entry of an order scheduling a hearing on certain of the First-Day Motions as soon as possible after the Petition Date.

19.     These First-Day Motions seek either fairly routine procedural or urgent relief that I consider to be critical to the Debtors' reorganization efforts.  I believe that the Debtors, their estates, creditors, and other parties-in-interest could be adversely affected if these First-Day Motions are not heard and considered by this Court as soon as possible after the Petition Date.  I further believe that postponing the hearing on these limited First-Day Motions could have disastrous effects on the Debtors and these cases.

<u>Debtors' Motion for Joint Administration</u>

20.     I have been advised that, during the course of these cases, it will be necessary to file numerous motions and applications, as well as other pleadings and documents, seeking relief on behalf of the Debtors.

21.     I believe that joint administration of the Debtors' Chapter 11 cases is in the best interests of the Debtors' estates, creditors, and other parties-in-interest and will further the interests of judicial economy and administrative expediency by, among other things,

obviating the need to file duplicate motions, to enter duplicate orders, and to forward unnecessary, duplicate notices to creditors and other parties-in-interest, which would result in unnecessary costs and expenses that would be borne by the Debtors' estates.

Debtors' Motion for Authority to Limit
Notice and to Establish Notice Procedures

22.     It is my understanding that the Debtors have identified thousands of entities to which notice must be given under the Bankruptcy Code, the Bankruptcy Rules, and/or the Local Bankruptcy Rules.  I believe that such notice would be extremely burdensome to the Debtors, costly to their estates, and in many instances unnecessary, as certain motions would have no bearing on certain parties.

23.     The establishment of notice procedures, as they have been explained to me, will promote the Debtors' efforts to maximize value for their creditors and other parties-in-interest by preserving assets that otherwise would be consumed by unnecessary copying, postage, and related expenses, and I do not believe the proposed notice procedures will inappropriately prejudice the rights of any parties-in-interest.

Debtors' Motion to Establish Case and Hearing Procedures

24.     I believe that the implementation of the Case Management Procedures, as they have been explained to me, would significantly minimize any procedural confusion that could occur in their absence.

25.     By scheduling regular omnibus hearings in advance, I believe that parties would be better able to plan for hearings, thereby reducing inefficiency and minimizing the need for emergency hearings and/or expedited relief.  In addition, implementation of the Case Management Procedures should ease the administrative burden for the Court and reduce the Debtors' administrative costs for these cases.

Debtors' Motion for (I) Waiver of Requirement
to File Matrix or List of Creditors, (II) Approval
of Form and Manner of Notifying Creditors of
Commencement of Chapter 11 Cases, and (III)
Waiver of the Requirements to File the Equity
<u>List and Provide Notice to Equity Security Holders</u>

26.     Given that the Debtors have retained, subject to Court approval, the Notice

Agent, I submit that requiring them to file a list of all of their creditors should not be necessary.

27.     I further submit that service of the Case Commencement Notice once the

Office of the United States Trustee has scheduled the meeting of creditors pursuant to

Bankruptcy Code § 341 on all creditors constitutes sufficient notice to creditors and would be an

efficient use of the Debtors' resources.

28.     Finally, I submit that preparing the Equity List and serving the Case

Commencement Notice on all parties on the Equity List will be expensive and time consuming

and will serve little or no beneficial purpose.

Debtors' Motion to Extend Time
<u>to File Schedules and Statements</u>

29.     As yet, it is my understanding that the Debtors have not had sufficient

time to collect and assemble all of the requisite financial data and other information and to

prepare all of the Schedules, as the requirements thereof have been explained to me.

30.     I believe that the Debtors have already begun, made significant progress,

and will continue to work diligently to compile the information necessary to complete the

Schedules.  To do so, the Debtors must gather information from various documents and locations

and complete the posting of their books and records as of the Petition Date or other dates, as

appropriate.  Then the Debtors (and their counsel) must review that information and prepare and

verify the Schedules.  Given the critical matters that the Debtors are currently dealing with, I will

need at least 30 days from the Petition Date to prepare the Schedules for filing.

31.     The Debtors' prior public filings provide a great deal of information and data.  Moreover, the narratives and data incorporated in the Debtors' Chapter 11 petitions, the exhibits attached thereto, and other pleadings and papers filed on the Petition Date should provide creditors and other parties-in-interest with a substantial amount of information about the Debtors and their financial affairs.

32.     Therefore, I believe that other parties would not be prejudiced if the Debtors were given an additional 30 days to file the Schedules.

Motion to Transfer Holding Court
for Hearings to Grand Rapids

33.     Proposed counsel for the Debtors, Cahill Gordon & Reindel LLP, is located in New York,[5] and traveling to Traverse City is more difficult and expensive than traveling to Grand Rapids.  I believe that travel for other interested parties would also be easier and less expensive to Grand Rapids than to Traverse City, and I have been informed that the Lenders support transferring the location of the holding court for hearings to Grand Rapids.

34.     In addition, these cases are complex and may require many hearings, including some hearings that could need to be heard on an emergency, expedited basis, subject to the Court's schedule and convenience.  Upon information and belief, frequent, regular hearings are not typically held in Traverse City.

35.     Finally, I do not believe that transferring the location of the holding court for hearings should prejudice any other parties.

---

[5]     Proposed co-counsel for the Debtors, Warner Norcross & Judd LLP, is located in Grand Rapids.

Application to Retain Donlin, Recano & Company, Inc.
<u>as Claims, Notice, and Balloting Agent</u>

36.     It is my understanding that the Debtors have thousands of creditors and other potential parties-in-interest.   Upon information and belief, the Clerk's Office is not equipped to (a) distribute notices, (b) process proofs of claim that may be filed in these cases, and (c) assist in the balloting process for these cases.   I believe that engaging an independent third party to act as an agent of the Court and the Clerk's Office is the most effective, efficient, and cost conscious manner by which to distribute such notices, process such proofs of claim, assist in the balloting process, and perform other related administrative tasks.

37.     I believe that Donlin, Recano & Company, Inc. is well-qualified to serve in the capacity as claims, notice, and balloting agent for the Debtors in these cases and that Donlin, Recano's retention is in the best interests of the Debtors' estates, creditors, and other parties-in-interest.   I, along with other representatives of the Debtors, chose Donlin, Recano based on both its experience and the competitiveness of its fees.

38.     I believe that the rates to be charged by Donlin, Recano for its services in connection with noticing, claims processing, and the solicitation process are competitive and either at or below the rates charged by its competitors.

Debtors' Motion for Order (I) Authorizing
Continued Use of Existing Bank Accounts, Cash
Management Systems, and Checks and Business
<u>Forms and (II) Granting Waiver of Bond Requirement</u>

39.     The Debtors have a number of bank accounts that they use in the ordinary course of business to enable them to manage their cash and to meet their obligations in a timely and efficient manner.

40.     In addition to the Accounts described below, the Debtors also maintain a

safe deposit box with NW Bank, which holds corporate papers.

   *Aurora Accounts*

   41.   Aurora maintains a concentration account with JP Morgan Chase Bank ("JPM"), account number 7305346474 (the "Aurora Concentration Account"), to receive deposits and send wires.  Aurora funds the Aurora Concentration Account when necessary from the Aurora Schwab Account and may maintain a minimum balance in it from time to time.[6]

   42.   Aurora also maintains an investment account with Charles Schwab, account number 7187-7136 (the "Aurora Schwab Account"), which holds most of Aurora's cash. As of the Petition Date, I estimate that approximately $2.3 million is on deposit in the Aurora Schwab Account.

   43.   Moreover, Aurora maintains a concentration account with NW Bank, account number 610211907 (the "NW Bank Concentration Account").  Until recently, payments made to the Debtors were received into the NW Bank Concentration Account, and the Debtors paid certain obligations by electronics fund transfer or wire from the NW Bank Concentration Account.  The Debtors maintain a balance in the NW Bank Concentration Account to cover pending checks written from the Disbursement Account.

   44.   In addition, Aurora maintained a disbursement account with NW Bank, account number 610240538 (the "Disbursement Account"), for obligations that had to be paid by check.  The Disbursement Account is a zero-balance account that is funded automatically only when necessary from the NW Bank Concentration Account.  Overnight, any balance in the NW Bank Concentration Account is swept into an investment account with NW Bank, account number 500211907 (the "Sweep Account"), and such balance is held, with any interest earned,

---

[6]   Immediately prior to the Petition Date, Aurora opened a disbursement account at JPM to write checks.  Aurora does not have the account number for this account yet.

until the NW Bank Concentration Account has a disbursement requirement; at which time the exact amount required to meet the disbursements are transferred to the NW Bank Concentration Account. As of the Petition Date, I believe there is approximately $70,000 in the Sweep Account.

45.     Lastly, Aurora maintains a money market account with NW Bank, account number 610239536 (the "Money Market Account"), which is used to hold cash and for future receipt of funds that are currently frozen in the Primary Reserve Fund as a result of the Lehman Brothers bankruptcy cases. The funds in, and to be transferred to, the Money Market Account have been posted as collateral for certain letters of credit. As of the Petition Date, approximately $660,000 is on deposit in the Money Market Account, but only approximately $160,000 is currently available.

*HPPC Accounts*

46.     HPPC maintains a concentration account with JPM, account number 730534682 (the "HPPC Concentration Account"), to hold most of its cash and to receive deposits, send wires, and write checks. The HPPC Concentration Account is funded from the HPPC Schwab Account when necessary.

47.     HPPC also maintains an account with Charles Schwab, account number 5718-9546 (the "HPPC Schwab Account"), which holds most of HPPC's cash. As of the Petition Date, I estimate that approximately $1.8 million is on deposit in the HPPC Schwab Account.

48.     Finally, HPPC maintains an account with NW Bank, account number 610226936, where until recently it deposited checks and received transfers from those customers that paid HPPC directly and paid obligations of HPPC. This account serves liked a zero balance

account, funded from time to time from another account with NW Bank, account number 500216936. As of the Petition Date, approximately $75,000 was on deposit in this account.

*Intercompany Transfers*

49.     Prior to the Petition Date, excess amounts of HPPC beyond known obligations, other than any deficiency claims of the Lenders, were held and not dividended or otherwise transferred to Aurora (and other minority interest holders). Accordingly, as of the Petition Date, I estimate that the balance in the HPPC Account is much more than any obligations (other than any deficiency claims of the Lenders).

50.     I believe that authorizing the Debtors to continue to maintain the Accounts and to utilize their cash management system in effect prior to the Petition Date, authorizing them to continue to utilize their existing business forms, including checks, and granting them a waiver, to the extent required, from the United States Trustee's guidelines, would facilitate a smooth transition into bankruptcy. The Debtors' employees, vendors, and other parties could suffer great hardship if the Debtors were compelled to substitute new debtor-in-possession payroll accounts, which could cause delays, confusion, and disruption of payments that would adversely affect, among other things, employee morale and relations with other essential parties.

51.     I submit that the Debtors' cash management procedures constitute ordinary and essential business practices similar to those used by other enterprises of similar size and complexity. The Debtors' cash management system enables them to provide necessary operational funds, to reduce the costs of borrowing funds by using all funds within the system, to develop more timely and accurate account balance information, and to comply with various statutes and regulations.

52.     Moreover, I believe that the Debtors' continued use of their existing cash

management system during these Chapter 11 cases is critical. I further believe that any disruption to the Debtors' ordinary business affairs could adversely impact their ability to reorganize, to the detriment of creditors and other parties-in-interest. The Debtors will continue to maintain strict records with respect to all transfers of cash for reporting and accounting purposes.

53.     Finally, if forced to replace their existing business forms, I believe that the Debtors would need to spend a substantial amount of time and money printing new business forms and stationery, which would disrupt the Debtors' ordinary business affairs and interrupt the normal payments to employees, vendors, well operators, and lease counterparties.

54.     Because they do not have significant long-term investments that could be at risk, I submit that cause exists for allowing the Debtors to continue to deposit or invest funds in accordance with their existing policies, which currently only involve overnight investments in certain of the Accounts, without the need for their banks to post securities or bonds. Indeed, the Debtors' banks are well-established, reputable banks that invest the Debtors' funds in accordance with their standard investment guidelines.

55.     Absent a waiver of the Bankruptcy Code § 345(b) bond requirements, I believe that the Debtors could be required to ask these banks to post securities or bonds secured by the undertaking of a corporate surety. These bonds likely would be unduly expensive (assuming they were even available) and could damage the Debtors' relationships with such banks. The Debtors could also be required to open new accounts and take other measures at great administrative cost, delay, and distraction, which would be inconsistent with the purpose of § 345(b).

56.     Finally, I submit that HPPC should be permitted to transfer any amounts it

holds in excess of other obligations (not including any deficiency claims of the Lenders) to Aurora in the ordinary course of business. Because funds will be set aside to cover any obligations of HPPC, no parties would be prejudiced by this requested relief, and it is my understanding that the Lenders have consented to and support granting the Debtors this authority.

Debtors' Motion to Establish Procedures for
(I) Settlement of Terminated Forward Contracts
and (II) Determination of Whether Certain Contracts
Constitute Forward Contracts and/or Whether Such
<u>Forward Contracts Have Been Validly Terminated</u>

57. The Debtors generate a substantial portion of their revenue from the production and sale of natural gas, and in connection therewith, they enter into contracts or agreements (a) to sell natural gas, (b) to transport extracted natural gas so it can be sold and marketed, (c) to balance quantities of natural gas upon transportation or at other times, and (d) to treat and/or remove contaminants or imperfections from mixed natural gas upon or after transportation or at other times. Each of these contracts or agreements, as well as others that the Debtors may be parties to, may constitute a Forward Contract.

58. I believe that authorizing the efficient settlement of Termination Payments pursuant to the Court-authorized Protocol is a necessary and appropriate use of this Court's powers under Bankruptcy Code § 105(a). I believe that the proposed procedures set forth in the Protocol, as they have been explained to me, would enhance the efficient administration of the Debtors' cases and permit the Debtors to expeditiously realize the value embedded in any terminated Forward Contract. I further believe that the proposed procedures are intended to preserve the Debtors' estates, to expedite the collection of payments owed to the Debtors, and to reduce the costs associated with the determination of Termination Payments. The proposed procedure for settlement of Termination Payments under the Forward Contracts should not only

minimize costs to the Debtors' estates by providing an economic and efficient resolution process, but it should also provide a means for protecting assets in the form of net Termination Payments due to the Debtors.

59.     Finally, I believe it is crucial for the preservation of the Debtors' estates to establish procedures for the resolution of certain disputes to determine whether certain contracts constitute Forward Contracts and whether parties to any such contracts have validly terminated them.   I believe this would allow the Debtors to avoid litigation costs that may arise in connection with non-consensual resolution of such disputes, as well as those costs associated with a disorganized, unstructured process for resolving these disputes.

Debtors' Motion for Order Establishing Notification
and Hearing Procedures for Trading in Equity Securities

60.     I have been informed that the Debtors have incurred, and continue to incur, significant NOLs.  I have also been advised that, if no trading restrictions regarding equity securities are imposed, the unrestricted trading or transfers of equity securities could severely limit or even eliminate the Debtors' ability to use their NOL carryforwards of more than $130 million (the "Tax Attributes"), with significant negative consequences for the Debtors, their estates, and the overall reorganization process.

61.     The Tax Attributes are of significant value to the Debtors and their estates because it is my understanding that the Debtors can carry forward their NOLs to offset future taxable income for up to 20 years,  thereby reducing their future aggregate tax obligations and freeing up funds to meet other obligations.  I further understand that the NOLs may also be utilized by the Debtors to offset any taxable income generated by transactions completed during these Chapter 11 Cases.

Debtors' Motion for Order (I) Authorizing Them to Pay
Pre-Petition Wages and Salaries and to Pay and Honor
Pre-Petition Employee Benefits and Related Obligations
and (II) Scheduling Final Hearing on Related Relief

62.     The Debtors pay salaries and wages to their employees and also generally participate in, or are obligated under, a number of different benefit structures, programs, and plans.  The Debtors also provide certain medical, dental, and related benefits to their employees.  Under these programs and plans, employees and other parties are owed and have accrued various pre-petition payments and benefits that have not yet been paid or otherwise realized.

*Salaries and Wages*

63.     The Debtors owe their employees salaries and wages for work performed pre-petition, possibly including overtime.  The Debtors pay their employees on the 15th and the last day of each month, with the payroll period closing on such days.[7]  All but one employee is paid by direct deposit.

64.     The Debtors utilize Automatic Data Processing, Inc. ("ADP") to facilitate and process its payroll.  In addition to certain quarterly and annual fees, ADP withdraws funds for administrative fees, which aggregate approximately $350 per month, shortly after processing payroll.

65.     As of the Petition Date, salaries and wages have accrued for pre-petition services on account of at most 11 working days, and I believe that the aggregate salaries and wages that have accrued, but has not yet been paid, are approximately $48,100.  No employees have outstanding claims for salary totaling more than $10,950.

*Withholdings*

66.     Included in the payroll amounts described above are funds the Debtors

---

[7]     The Debtors fund their payroll the day before a scheduled pay date.

withhold for the benefit of third parties, including federal, state, and local taxes, medical and health deductions, and other withholdings requested by employees or required by federal, state, and local laws.

67.    ADP withdraws all withholding amounts at the same time it withdraws salary amounts from the Debtors' accounts.  ADP then transfers these withheld funds to the appropriate parties, except amounts related to the 401(k) Plan, the Flex Spending Plan, AFLAC, and HSA Accounts, which amounts ADP calculates, and the Debtors themselves transfer to the appropriate recipients.

*Severance*

68.    The Debtors maintain a severance program for non-management employees, whereby such employees would receive the greater of six weeks or two weeks per year of service upon termination.  The Debtors wish to continue their severance plan for any employees terminated after the Petition Date.

*401(k) Plan*

69.    The Debtors sponsor and administer a 401(k) savings plan for employees that are over 21 years of age and that have completed at least one year of employment. Employees wishing to participate in the 401(k) Plan may enroll in the quarter after they become eligible.

70.    Pursuant to the 401(k) Plan, the Debtors withhold, at an eligible employee's request, up to 100% of such employee's annual, pre-tax pay for contribution to the 401(k) Plan, subject to applicable limitations imposed by the Internal Revenue Code.  Prior to June 1, 2009, the Debtors matched 50% of employees' contributions, up to 6% of such employees' salary, with 20% vesting after two years, 50% vesting after three years, and 100%

vesting after four years, but as of June 1, 2009, they stopped matching contributions.  I believe that the aggregate amount of all funds withheld under the 401(k) Plan prior to the Petition Date, including any previously-matched funds, but not yet transferred is approximately $3,150.

71.     The 401(k) Plan is administered by KDP Retirement Plan Services Inc. ("KDP"), with investment plans managed by The Hartford, and on a pay day, the Debtors transfer the appropriate funds calculated by ADP to KDP.  The Debtors pay KDP quarterly administrative fees of $325 per quarter, as well as other fees when distributions are made and new participants are added to the 401(k) Plan, and certain of these fees may have accrued prior to the Petition Date.

*Reimbursement of Expenses*

72.     In the ordinary course of business, the Debtors reimburse employees for out-of-pocket expenses attributable to their employment, including mileage allowances. Employees are required to submit expense reimbursement forms and copies of applicable receipts for review and approval.

73.     In addition, as part of their compensation, the Debtors' vice president of exploration and production is entitled to a housing allowance of $2,500 per month, and the Debtors' operations manager, is entitled to a home office allowance of $600 per month.  The former's allowance is paid through payroll, twice a month in equal payments, and the latter's allowance is paid as an expense reimbursement.

74.     As of the Petition Date, certain employees may not yet have submitted expense reimbursement requests, or such requests may have been made but not yet processed, and I estimate that the amount of expenses accrued prior to the Petition Date but not yet reimbursed should not exceed $1,000.

*Holidays, Sick, Personal, and Vacation Days*

75.    Employees are eligible for paid holidays and sick and personal days, and they accrue vacation during the course of their employment, as described below:

(a)    *Holidays*:  the Debtors offer employees eight paid holidays per year.

(b)    *Sick Days*:  the Debtors offer employees five paid sick days per year, and employees may carry over up to five unused sick days each year.

(c)    *Personal Days*:  the Debtors offer two paid personal days per year, which can be taken on an hourly basis.  Employees are not eligible for personal days until January after their first anniversary of employment.

(d)    *Vacation*:  the Debtors offer 10 vacation days for employees with less than five years of employment; 15 vacation days for employees with more than five years but less than 10 years of employment; and 20 vacation days for employees with more than 10 years of employment.  During an employee's first year of employment, vacation days are prorated and are not available until the employee has worked for six months.  Employees may carry over up to five unused vacation days each year.

Only unused vacation is paid to employees upon resignation or termination.

76.    As of the Petition Date, I believe that the Debtors have accrued approximately $47,000 on account of unused vacation days.

*Employee Insurance Plans and Programs*

77.    The Debtors offer various employee insurance plans and programs.  For instance, on the first day of the month immediately following the day a full-time employee has been employed for 30 days, they provide such employee medical insurance benefits through Priority Health and preventive, basic, and major dental coverage through Shenandoah Life Insurance Company.

The Medical Plan

78.     The Debtors provide eligible employees with coverage under the Medical Plan through the Priority Health PriorityHSA HMO Plan, which offers, among other things, (a) preventive and hospital care covered at 100% for in-network providers; (b) deductibles of $1,150 per person and $2,300 per family, and copays of $50 per emergency room visit and ambulance trip and varying percentages for other treatments and procedures; (c) prescription drug coverage with copays of $10 for generic and $40 for brand name drugs; and (d) the ability to participate in health savings accounts with pre-tax earnings.

79.     I believe that all employees electing coverage under the Medical Plan have opened up HSA Accounts.  Several employees voluntarily contribute to such accounts through payroll deductions, and the Debtors contribute $100 per individual and $200 per family each month into all employees' HSA Accounts.  Employee contributions, which total approximately $975 per cycle, are made each payroll cycle, and employer contributions, which total approximately $3,800 per month (including recently-terminated employees for two months), are made at the end of each month.

80.     Under the Medical Plan, the Debtors pay all associated premiums for employees and dependents, and these premiums total approximately $14,900 per month (including recently-terminated employees, less amounts related to COBRA).

The Dental Plan

81.     Among other things, the Dental Plan provides for 50% coinsurance for most dental procedures, but it does not provide for orthodontic coverage.  The Dental Plan also has an $800 in- and out-of-network maximum, but no deductible.

82.     Under the Dental Plan, the Debtors pay 100% of the associated premium

for employees, with applicable employees paying 100% for dependent coverage. The Debtors pay Shenandoah Life approximately $920 per month in premiums (including recently-terminated employees, less COBRA-related amounts) under the Dental Plan.

The Flex Spending Plan

83.    Moreover, through Total Administrative Services Corporation ("TASC"), the Debtors offered eligible employees the opportunity to participate in a flexible spending plan (the "Flex Spending Plan") that allowed them to withhold, on a pre-tax basis, amounts for reimbursement of eligible medical care expenses and dependent care expenses, up to limits set by the Internal Revenue Service. The Debtors recently terminated the Flex Spending Plan, but it is possible that minimal amounts may not have been transferred to TASC.

Additional Insurance Plans

84.    The Debtors allow (but do not provide) eligible employees the ability to purchase additional insurance, including life and accidental death and dismemberment coverage, through AFLAC, with the applicable premium amounts being withheld from electing employees' paychecks and paid over to AFLAC. As of the Petition Date, there is only one participating employee, and I do not believe any related premiums have been withheld but not yet paid to AFLAC.

85.    It is my understanding that under Michigan law, the Debtors are required to provide employees with workers' compensation coverage for injuries occurring in the course of their employment. In connection with the Workers' Comp Plan, the Debtors maintain an insurance policy with Insurance Company of Pennsylvania and pays an annual premium of approximately $45,000 under such policy, which has already been paid.

*COBRA*

86.    The Debtors also offer eligible former employees the opportunity to continue insurance coverage under then-existing medical and dental plans.  I understand that eligible former employees who elect to participate in COBRA are entitled by law to insurance coverage for up to 18, 29, or 36 months.

87.    Two former employees receive COBRA benefits.  The Debtors advance amounts due for COBRA and then are reimbursed by former employees for such amounts.  To the extent a former employee does not do so, COBRA coverage is cancelled.

88.    Obligations under COBRA are approximately $1,200 per month for medical and $60 per month for dental.  As of the Petition Date, I do not believe the Debtors have any outstanding pre-petition COBRA obligations.

*Other Benefits*

89.    The Debtors also provide eligible employees with various other benefits that may have accrued prior to the Petition Date but have not yet been paid.  Such benefits include paid time off for jury duty, military leave, and bereavement.  As of the Petition Date, I do not believe that the Debtors owe any amounts for such other benefits.

90.    It is imperative that the Debtors be permitted to continue to pay and honor all pre-petition obligations to employees and other parties, including but not limited to obligations: (a) to pay pre-petition wages, salaries, expense reimbursement, and related benefits and amounts due on account of the 401(k) Plan and other related amounts; (b) to pay amounts associated with the Medical Plan, the Dental Plan, and other related insurance programs; (c) to pay all costs and expenses due for the administration, servicing, and processing of employee benefits described above; and (d) to satisfy all other pre-petition employee benefits, including

honoring pre-petition severance, holiday, sick, personal and vacation pay policies. I have been advised that the Debtors will have the cash on hand to pay the wages, salaries, reimbursements, and other benefits described above.

91.    I believe that failure to pay any pre-petition obligations to employees will severely undermine the morale of the Debtors' employees, which is currently at a very sensitive stage because employees are being asked to commit much of their time and energy to the Debtors' reorganization efforts (a task to which they have already been committed to for some time). I believe that allowing the Debtors to pay their employees will bolster the morale of their employees and will contribute to the Debtors' reorganization process.

92.    Many of the Debtors' employees are dependent upon their wages, salaries, reimbursements, and benefits. If the amounts owed to the Debtors' employees are not received, insurance premiums are not paid in the ordinary course, or other benefits are delayed, altered, or terminated, I believe that the Debtors' employees may suffer extreme personal hardship and, in many cases, will be unable to pay their basic living expenses, causing serious harm to them and their families and potentially making it difficult or impossible to continue their employment with the Debtors. This could severely disrupt the Debtors' relationships with their employees, seriously jeopardizing the Debtors' ability to operate and reorganize.

Debtors' Motion for Authority to Pay
Pre-Petition Real and Personal Property Taxes

93.    In connection with the normal operation of their business, the Debtors accrue real and personal property taxes. The Debtors are subject to periodic normal course of business audits to assess any unpaid taxes that they may owe. In the various states in which they operate or own or lease property (primarily Michigan, Indiana, and Kentucky), it is my understanding that failure to pay the Pre-Petition Taxes could result in the Debtors' forfeiting

necessary business licenses, losing the ability to conduct business, or potentially being subject to tax liens.

*Real Estate Taxes*

94.    The Debtors pay real estate taxes to various state and local taxing authorities in connection with certain of their projects and facilities, on the terms generally outlined below:

| <u>Payee</u> | <u>Due Date(s)</u> | <u>Estimated Payment</u> |
|---|---|---|
| Hardin County, Illinois | August 31 and October 30, 2009 | $370 (total) |
| Township of Smith, Greene County, Indiana | August 17 and November 11, 2009 | $450 (total) |
| Township of Perry, Martin County, Indiana | July 24, 2009 | $500 |
| Township of Sanborn, Alpena County, Michigan | September 15 and February 15, 2010 | $20 (total) |
| Township of Sanborn, Alpena County, Michigan | September 15, 2009 and February 15, 2010 | $980 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $840 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $1,180 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $1,010 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $700 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $14,600 (total) |
| Township of Nunda, Cheboygan County, Michigan | September 15, 2009 and February 15, 2010 | $335 (total) |
| Township of Wilmot, Cheboygan County, Michigan | September 15, 2009 and February 15, 2010 | $445 (total) |
| Township of Garfield, Grand Traverse County, Michigan | September 15, 2009 and February 17, 2010 | $65,000 (total) |

| Payee | Due Date(s) | Estimated Payment |
|---|---|---|
| Township of Montmorency, Montmorency County, Michigan | September 14, 2009 and February 15, 2010 | $180 (total) |
| Township of Montmorency, Montmorency County, Michigan | September 14, 2009 and February 15, 2010 | $215 (total) |

*ESTIMATED TOTAL REAL PROPERTY TAXES DUE OR ACCRUED AS OF PETITION DATE*: **$86,825**

*Personal Property Taxes*

95.     The Debtors also pay personal property taxes to state and local taxing authorities, in the amounts and on the terms generally outlined below:

| Payee | Due Date | Estimated Payment |
|---|---|---|
| Township of Wayland, Allegan County, Michigan | September 15, 2009 and February 17, 2010 | $570 (total) |
| Township of Chandler, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $25,200 (total) |
| Township of Chandler, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $4,100 (total) |
| Township of Hudson, Michigan | September 14, 2009 and February 15, 2010 | $170,000 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $56,000 (total) |
| Township of Hudson, Charlevoix County, Michigan | September 14, 2009 and February 15, 2010 | $14,400 (total) |
| Township of Wilson, Charlevoix County, Michigan | September 15, 2009 and February 15, 2010 | $1,900 (total) |
| Township of Forest, Cheboygan County, Michigan | September 16, 2009 and February 15, 2010 | $10,800 (total) |
| Township of Turner, Gladwin County, Michigan | September 15, 2009 and February 16, 2010 | $330 (total) |
| Township of Garfield, Grand Traverse County, Michigan | September 15, 2009 and February 17, 2010 | $6,700 (total) |
| Township of Montmorency, Montmorency County, Michigan | September 14, 2009 and February 15, 2010 | $3,600 (total) |
| Township of Montmorency, Montmorency County, Michigan | September 14, 2009 and February 15, 2010 | $9,000 (total) |
| Township of Montmorency, Montmorency County, Michigan | September 14, 2009 and February 15, 2010 | $54,000 (total) |
| Township of Comins, Oscoda County, Michigan | September 15, 2009 and February 17, 2010 | $700 (total) |

| Payee | Due Date | Estimated Payment |
|---|---|---|
| Township of Clinton, Oscoda County, Michigan | September 14, 2009 February 15, 2010 | $200 (total) |
| Township of Corwith, Otsego County, Michigan | September 14, 2009 and February 17, 2010 | $27,300 (total) |
| Township of Corwith, Otsego County, Michigan | September 14, 2009 and February 17, 2010 | $1,800 (total) |
| Township of Corwith, Otsego County, Michigan | September 14, 2009 and February 17, 2010 | $900 (total) |
| Township of Wilmot, Otsego County, Michigan | September 14, 2009 and February 16, 2010 | $25,400 (total) |
| Township of Wilmot, Otsego County, Michigan | September 14, 2009 and February 17, 2010 | $5,000 (total) |
| Juab County, Utah | December 1, 2009 | $10 |
| Box Elder County, Utah | December 1, 2009 | $150 |

*ESTIMATED TOTAL PERSONAL PROPERTY TAXES DUE OR ACCRUED AS OF PETITION DATE:* **$418,060**

96.     The Debtors may have incurred other taxes or similar obligations, such as yearly minimum corporate taxes and other business licensing fees, that are not yet reflected on their books and records or are otherwise not currently known to be due and owing or accrued.

97.     I believe that it is necessary for the Debtors to pay the Pre-Petition Taxes when they become due.  If they fail to do so, the Debtors could potentially be restricted from doing business in certain states, with dire effects on their ability to reorganize.  Indeed, I have been advised that any failure to pay the Pre-Petition Taxes may result in an audit or investigation by one or more taxing or other governmental authorities.  Similarly, if a taxing authority were to obtain a lien on the Debtors' assets or properties, it would prevent the Debtors from using them and could result in such taxing authority's attempting to sell such properties or assets.  I believe that any of these scenarios would greatly threaten the Debtors' ability to reorganize and would cause an unnecessary distraction during these critical times.

98.     Moreover, I believe that allowing the Debtors to pay the Pre-Petition Taxes in their discretion would actually benefit other parties, as it would ensure that the Debtors

can continue to operate and generate revenues from their production facilities in the applicable states. I submit that the aggregate amount of the Pre-Petition Taxes at issue is relatively small, especially considering that a failure to make these payments could stifle the Debtors' reorganization efforts, to the detriment of all parties-in-interest

Debtors' Motion for Order Authorizing Payment of Rent,
<u>Royalties, and Related Amounts to Lessors and Taxing Authorities</u>

99.    The Debtors generate a substantial amount of their revenue from the production and sale of oil and natural gas. I have been advised that the Debtors are party to approximately 12,000 Oil & Gas Leases with various lessors for sites primarily located in Michigan, Kentucky, Indiana, and Texas.

100.    Pursuant to the terms of the Oil & Gas Leases, the Debtors have acquired certain rights from the Lessors for the purposes of developing and producing oil and/or natural gas, together with related rights and easements. To that end, in the normal course of their business, the Debtors own interests in wells and related production facilities on the premises governed by the Oil & Gas Leases.

101.    As a result of entering into the Oil & Gas Leases, the Debtors have obtained a working interest in a total of approximately 1.16 million gross acres, with over 3,000 net potential drilling locations thereon. Specifically, the Debtors have an extensive leasehold position in two geographical areas: (a) the Antrim shale region of Michigan (approximately 286,000 gross acres leased),[8] and (b) the New Albany shale region of Indiana and Kentucky (approximately 782,000 gross acres leased).[9]

---

[8]    The Debtors' Antrim shale properties provide approximately 640 wells and represent the majority of the Debtors' production and proven reserves.

[9]    The Debtors' New Albany shale properties provide approximately 61 wells and represent the majority of the Debtors' undeveloped acreage base.

*Rent, Royalties, and Other Lease Payment Obligations*

102.    All but approximately 400 of the Oil & Gas Leases are so-called "paid-up" leases, meaning that the Debtors have made an initial up-front payment to the applicable Lessor and do not make annual or other lease payments.  These paid-up leases are usually for a primary term of three to five years, which term may be extended for an additional three to five years at the Debtors' option upon the payment of a renewal fee.  The initial term of certain of the paid-up Oil & Gas Leases are expiring in the near future and may require the Debtors to pay related Paid-Up Renewal Fees in order to preserve their rights to drill and produce oil and natural gas.

103.    The remaining approximately 400 Oil & Gas Leases, most of which are located in Michigan, require annual rental payments.  For such "rental" leases, the Debtors paid an up-front "bonus" payment as consideration for the first year of the lease term and are required to make rental payments to extend the lease for additional years, up to the maximum term provided for in the lease.  The rental leases are generally for a five-year term and many may be extended at the Debtors' option for one or two additional years upon payment of a renewal fee, which is generally larger than that required to renew a paid-up lease, prior to each extension year.  Certain of the rental leases are expiring by their terms and require Rental Renewal Fees to preserve the Debtors' rights to drill and produce oil and natural gas therefrom.

104.    The Debtors begin paying royalties to a Lessor only once production has begun on a particular Oil & Gas Lease, and the term of such Oil & Gas Lease, regardless of whether it is paid-up or not, may be extended for as long as oil and or gas is being produced and sold.  As of the Petition Date, the Debtors have begun producing oil or gas, and therefore paying royalties, under approximately 321 of the Oil & Gas Leases.

105.    The amount of royalties owed to each Lessor is based on the amount of net

proceeds realized from the sale of oil and/or gas extracted (after deducting certain of the Debtors' costs as specified in the particular Oil & Gas Lease). Typically, the Debtors are required to pay the applicable Lessor $1/8^{th}$ of the net amount realized from such sale. The Debtors generally make royalty payments on a monthly basis, provided that the applicable royalties exceed $50; if the royalties do not exceed this amount in a particular month, the Debtors delay paying royalties for that lease until the next month in which the cumulative delayed royalties exceed the $50 threshold. The total amount of royalties the Debtors pay per month normally does not exceed $200,000.

106.    If all the wells on a particular Oil & Gas Lease or on a unit in which the Oil & Gas Lease has been included are "shut-in" (or temporarily closed off), then generally within 60 days after the wells have been shut-in and each year or quarter-year thereafter (depending on the terms of the underlying Oil & Gas Lease), the Debtors must make "shut-in payments," as provided for in the particular Oil & Gas Lease. If the Debtors fail to make required shut-in payments, they may lose their interest in the underlying Oil & Gas Lease. The total amount of shut-in payments the Debtors pay per month normally does not exceed $1,336.

*Severance Taxes and Fees*

107.    The Oil & Gas Leases generally authorize the Debtors to pay all of the taxes and privilege fees levied upon the gas produced, which generally include gas severance taxes and fees and, potentially, real estate taxes. The Debtors pay these amounts in order to avoid remedial action, which could include investigations, audits, or imposition of liens, being taken by the agency designated to collect the applicable tax or charge, only when the Lessor fails or refuses to do so.

108.    In general, these gas severance taxes and fees are based on the value of the

gas produced in the applicable state.  Specifically, I have been advised that Michigan imposes a 5% severance tax  and an additional fee of 0.75% of the value of gas produced, and Indiana imposes a severance tax equal to the greater of  $0.03 for each thousand cubic foot of gas produced or 1% of the value of gas produced.

*Total of Pre-Petition Lease Obligations*

109.    I estimate that, as of the Petition Date, the Debtors owe the Lessors no more than approximately $125,000 in total rents, royalties, revenue distributions, and related payments (collectively, the "Pre-Petition Royalties") that accrued prior to the Petition Date and remain unpaid.  In addition, I believe that approximately $41,344 in Renewal Fees must be paid in order to avoid termination of certain Oil & Gas Leases.   Finally, I estimate that no taxes or privilege fees with respect to the Oil & Gas Leases may have accrued prior to the Petition Date and remain unpaid as of the date hereof.

110.    The Debtors' business is predicated on their ability to maintain the Oil & Gas Leases, which are among the Debtors' most valuable assets.  I believe the Debtors' ability to continue to operate without disruption under the Oil & Gas Leases is vital to their ongoing operations and a successful reorganization.  Moreover, I believe that paying any Renewal Fees is necessary to protect and preserve the Oil & Gas Leases, which currently, or may in the future, generate meaningful revenue.

111.    In the normal course of business, the Debtors, in accordance with the terms and conditions of the respective Oil & Gas Leases, endeavor to pay all valid amounts due to the Lessors from the proceeds derived from the applicable Oil & Gas Lease.  Upon the filing of these cases, however, it is my understanding that the outstanding pre-petition obligations relating to rents, royalties, taxes, privilege fees, and related payments under the Oil & Gas

Leases (the "Pre-Petition Lease Obligations") could constitute general unsecured pre-petition claims, and the Debtors would be barred from paying them.  I am concerned about such effect upon the Debtors' relationships with the Lessors, and I desire to avoid any harm thereto, which clearly would adversely affect the Debtors' business and reorganization prospects.  I believe that the amount of the Pre-Petition Lease Obligations is relatively small in the context of these cases.

112.    Moreover, it is my understanding that certain of the Lessors may, under applicable state law or the Uniform Commercial Code, attempt to assert a lien to secure the payment of any unpaid Pre-Petition Lease Obligations.  To the extent that any Lessor or other party attempts to assert such a security interest, it could potentially impede the Debtors' ability to successfully sell their gas or otherwise impair the Debtors' operations.

113.    I believe that permitting the Debtors to pay the Pre-Petition Lease Obligations and to pay Renewal Fees would enable them not only to avoid any potential disruptions under the Oil & Gas Leases and to maintain positive relationships with the Lessors, but would also permit them to continue to operate in the normal course of business and to generate revenues, to the benefit of all parties-in-interest.  As such payments would be in their discretion, I believe that the Debtors would generally decline to make payments to any Lessor who did not expressly agree that such payment would be in full satisfaction of all claims or liens of such Lessor that had accrued prior to the Petition Date (including any potential default claims).

114.    In addition, I believe that it is necessary for the Debtors to satisfy any due and owing taxes and privilege fees under the Oil & Gas Leases.  If they fail to do so, the Debtors could potentially be restricted from doing business in certain states, with dire effects on their ability to operate and reorganize.

115.    Indeed, if the Debtors were not authorized to pay the Pre-Petition Taxes and Fees, it is my understanding that appropriate authorities could potentially take steps to impair or prevent the Debtors from producing or selling gas from their leaseholds, at great harm to the Debtors' estates.  If a taxing authority were to obtain a lien on any of the Debtors' assets or properties, it could result in a taxing authority attempting to seize or sell such properties or proceeds.  Furthermore, the failure to pay at least certain of the Pre-Petition Taxes and Fees may result in one or more of the taxing or other governmental authorities auditing the Debtors or commencing a similar investigation, which I believe would unnecessarily divert the Debtors' attention and would threaten the successful and efficient reorganization of the Debtors.

116.    In any event, payment of the Pre-Petition Taxes and Fees should not prejudice the Debtors' creditors, estates, or other parties-in-interest.  I believe that allowing the Debtors to pay the Pre-Petition Taxes and Fees should actually benefit other parties, as it would ensure that the taxing authorities would not interfere with the Debtors' ability to produce and sell gas, enabling the Debtors' operations to run smoothly

Debtors' Motion for Authority to Pay Pre-Petition
Claims of (I) Critical Vendors Providing Services for
<u>Operated Properties and (II) Operators of Other Properties</u>

117.    The Debtors' operations primarily involve the acquisition of oil and gas leases and the production and sale of natural gas extracted from such leases.

*Operated Properties*

118.    Specifically, the Debtors operate primarily in the Antrim shale area, utilizing third-party vendors and service providers to aid in  the extraction, transportation, compression, processing, and sale of gas.  In addition, in other instances, the Debtors partner in joint ventures with third parties that function as operators under some form of an operating

agreement. When the Debtors operate the wells and properties themselves, they hire third parties, and as of the Petition Date, they likely owe certain of these parties amounts for pre-petition services.

119.   Without the continued support of, and services to be provided by, the Critical Vendors, I believe that the Debtors may not be able to continue operating these particular properties without great added cost and likely delay. Indeed, in many instances, it is my understanding that the services provided by particular Critical Vendors are unique, and no replacement vendors or service providers are available in a timely fashion without significant cost and hardship.

120.   As of the Petition Date, I believe that pre-petition amounts owed to the Critical Vendors are approximately $512,000.

*Non-Operated Properties*

121.   In other situations, the Operators extract, transport, process, and sell natural gas for the Debtors, as well as maintain books and records, pay drilling and operating expenses, bill non-operators (including the Debtors), and maintain insurance, and then the Debtors and the Operators share the associated costs and revenues. I believe that the Operators provide their own employees or contractors, and the terms of the Operating Agreements generally last as long as the underlying wells are producing.

122.   I believe that certain of the Operators could file claims, attempt to assert liens, or engage in actions adverse to the Debtors on account of pre-petition arrearages or simply because of the commencement of these bankruptcy cases.

123.    As of the Petition Date, I believe that amounts outstanding under the Operating Agreements are approximately $233,000.[10]

124.    To avoid interference with their business, and because the Critical Vendors and the Operators may have claims, liens, and/or set-off rights superior to those of other parties, I believe that it is necessary to pay the Critical Vendor Claims and the Operating Agreement Claims, the sum total of which — less than $750,000 — is relatively modest for these cases, especially in light of the resultant costs if such claims are not immediately paid, the validity of which the Debtors would determine in their discretion.  Indeed, preservation of the Debtors' relationships with the Critical Vendors and the Operators is critical because the Debtors are dependent on them to extract and process natural gas, to generate revenue, and to continue their Debtors' operations.

125.    In fact, I believe that any disruption in the Debtors' relationship with the Critical Vendors or the Operators, however minor, could cripple, and would at least hinder, the Debtors' reorganization efforts.  Indeed, if even one of the Critical Vendors or the Operators refused to extract natural gas and/or to provide extracted natural gas to the Debtors or to perform any related services, I believe that the Debtors could need to, among other things, shut in certain wells, requiring them to pay related fees and costs or potentially forfeit the underlying leases and significant potential revenue, and find other vendors or well operators, potentially at great cost, both in terms of money and delay.

---

[10]    None of the amounts the Debtors propose to pay pursuant to this Motion are to be paid to "insiders" or entities or persons affiliated with the Debtors.  Two of the Operators, however, are (a) Presidium Energy LC, whose president is John Miller, a former officer of the Debtors, and (b) Corona Resources, of which Jeffrey Deneau, a non-executive officer of the Debtors and son of the Debtors' former Chief Executive Officer and current non-executive chairman of the board, is a working interest owner in certain properties Corona Resources operates.

126.    In addition, if the Debtors are unable to pay the Critical Vendors and Operators, I believe the Debtors could have to address multiple actions and would need to challenge many asserted liens, which could result in the unnecessary expenditure of significant funds at this crucial time.  Certainly, at this time, I believe that the Debtors cannot afford this sort of distraction and the inherent harm that would result, and the required agreement for the Critical Vendors to provide go-forward trade terms and credit and/or the waiver of claims and agreement to waive and/or not to exercise related rights that the Debtors would obtain from the Critical Vendors and/or the Operators that accept payment, as they have been explained to me, would help alleviate such potential harm.

127.    Finally, given that the Critical Vendors and the Operators may be entitled to certain liens on underlying property, among other potential rights, other parties would not be prejudiced if the Debtors were permitted to pay the Critical Vendor Claims and the Operating Agreement Claims.  Such claims would likely have to be paid by the Debtors under a plan of reorganization, if not earlier, so payment of the Operating Agreement Claims only affects timing, and given that such a shift in timing would ensure the continuation of the Debtors' operations at this critical time, to the benefit of all parties, I believe it is necessary.

Debtors' Motion for Order (I) Prohibiting Utility
Companies from Altering, Refusing, or Discontinuing
Service, (II) Deeming Utilities Adequately Assured of
Future Performance, and (III) Establishing Procedures
for Determining Adequate Assurance of Payment

128.    In connection with the operation of their business and management of their properties, the Debtors obtain electricity, water, sewer, telephone, communications, and other similar services (collectively, the "Utility Services") from various utility companies.

129.    I believe that the Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to their reorganization efforts.

130.    Furthermore, the Utilities Order provides the Utility Companies with a fair and orderly procedure for determining requests for additional or different assurance.  Without the Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Companies in a disorganized manner at a critical period in these cases and during a time when the Debtors' efforts could be more productively focused on ensuring a successful reorganization.

Debtors' Application to Employ and to
Retain Cahill Gordon & Reindel LLP as
<u>Bankruptcy and Restructuring Counsel</u>

131.    To facilitate the successful reorganization of their businesses and for bankruptcy advice and counsel during these cases, I believe that the Debtors require the services of attorneys with knowledge and experience in numerous areas of the law, including, without limitation, bankruptcy, restructuring, finance, tax, real estate, litigation, and general corporate and security law matters.  The Debtors have selected Cahill as their counsel in these cases because of its considerable experience in such and other matters, as well its extensive understanding of the Debtors' business and operations.

132.    To the best of my knowledge, information, and belief, and except as disclosed in the Levitin Affidavit, the partners, associates, and other professionals of Cahill have no relationship to the Debtors or to any other party-in-interest in these cases.

Debtors' Motion for Order Authorizing Entry
Into Agreement with Huron Consulting Services LLC,
Retention of Chief Restructuring Officer,
<u>and Assumption of Such Agreement</u>

133.    Prior to the commencement of these Chapter 11 cases, the Debtors determined it was necessary to hire a financial and restructuring consultant to assist them in negotiations with key stakeholders and to prepare for a potential bankruptcy filing.  Accordingly,

on or about May 1, 2009, the Debtors retained Huron to provide financial and other advisory services.

134.    Then, in the course of negotiations with the Lenders and the execution of the most recent forbearance and tolling agreement, the Debtors were required to retain a chief restructuring officer and chose to retain Huron, pursuant to the terms of the Huron Agreement, to provide them with a CRO as well as other restructuring management services.  In addition to the key roll it has in the Debtors' restructuring efforts and related negotiations with key stakeholders, I have been advised that Huron would assist the Debtors' management, board of directors, and other professionals in evaluating current operations, liquidity, and various go-forward strategies.

135.    Pursuant to the Huron Agreement, the Debtors provided Huron with a $100,000 retainer to be applied to Huron's pre-petition fees and expenses.  I have been advised that any excess retainer will be held by Huron for application to post-petition fees and expenses.  Huron will be compensated on an hourly basis for actual hours worked, to be paid weekly in arrears.  The hourly rates for Huron professionals range from $300 to $525 an hour, depending on experience and expertise.  Out-of-pocket expenses would be billed by Huron at the actual amounts incurred.

136.    The Debtors may terminate the Huron Agreement at any time and for any reason upon providing written notice of termination.  Huron, in turn, may terminate the Huron Agreement at any time upon 30 days' prior written notice to the Debtors, and it may terminate for breach if, within 15 days' notice, the Debtors fail to cure any purported breach.

137.    Based upon a careful analysis of the facts and circumstances of these cases, the Debtors, in a sound and prudent exercise of their business judgment, have decided to enter into the Huron Agreement and, if necessary, to assume the Huron Agreement, so as to

permit them to continue to employ Huron and the CRO and to make use of valuable related services during these cases.

138.    I believe that it is crucial for the Debtors to retain Huron to ensure success in their reorganization efforts.  I have been advised that Huron has been and will continue to be crucial in negotiations with key stakeholders, and certain Huron professionals, including the CRO, are regularly at the Debtors' Traverse City headquarters advising the Debtors on day-to-day operational and related issues.  Upon the recommendation of Huron professionals, and as a result of their expertise and assistance, the Debtors have already been able to reduce their workforce, eliminate redundancies, and cut significant costs.

139.    The services to be provided by Huron are valuable and unique, and I do not believe there will be any unnecessary duplication of work.  I believe that the delay and costs inherent if some other advisor were hired could cripple the Debtors' reorganization efforts.

140.    Hence, in order for the Debtors to maintain their businesses as going concerns and complete a successful reorganization, for the benefit of their stakeholders, I believe that the continued involvement of Huron is required.  Assumption of the Huron Agreement will enable the Debtors to continue to utilize the skills and resources of Huron and the CRO. Accordingly, I believe that assumption of the Huron Agreement is warranted under the facts and circumstances of these cases.

141.    Additionally, I believe that the fees provided for in the Huron Agreement are fair and reasonable and comparable to those charged by Huron and similar firms in comparable engagements, as I have been informed about such matters.

Debtors' Application to Employ
<u>and Retain Beachwalk Capital LLC</u>

142.    Prior to the commencement of these Chapter 11 cases, the Debtors retained Beachwalk Capital LLC ("BC") to assist them in connection with a potential restructuring of their operations and recapitalization of their funded debt and other obligations and to lead negotiations with the Lenders.

143.    I believe that the Debtors will require the assistance and expertise of BC during these bankruptcy cases. The Debtors seek to continue to retain and employ BC because, among other things, BC has extensive knowledge of, and relevant experience in, similar matters.

144.    Prior to the Petition Date, the Debtors engaged BC to provide advice in connection with their attempts to complete a strategic restructuring, reorganization, and/or recapitalization, as well as to prepare for the potential commencement of these Chapter 11 cases. I believe that BC has been, and will continue to be, instrumental in negotiating and assisting the Debtors in consummating any restructuring.

145.    In providing pre-petition services to the Debtors in connection with these matters, BC has worked closely with the Debtors' management and other professionals and has become intimately acquainted with the Debtors' operations, debt structure, creditors, business, and related matters. Accordingly, I believe BC has developed significant relevant experience and expertise with respect to the Debtors that will assist it in providing effective and efficient services in these Chapter 11 cases.

146.    I believe that the compensation, expense, and indemnification structure proposed for BC is both fair and reasonable in light of the type of services BC proposes to provide. I have been advised by BC that BC would endeavor to coordinate with the other

retained professionals in these bankruptcy cases to eliminate unnecessary duplication or overlap of work.

Debtors' Motion for Authority to Employ and Retain
Professionals Used in the Ordinary Course of Business

147.    It is my understanding that the Debtors desire to continue to employ the Ordinary Course Professionals to render services to the Debtors' estates similar to those services rendered prior to the Petition Date and to retain any additional Ordinary Course Professionals that may be necessary throughout these cases.  These professionals would provide specialized legal, accounting, auditing, business management, oil and gas consulting, engineering, and tax advisory services.

148.    Prior to the Petition Date, the Debtors utilized numerous professionals to provide the services required to assist the Debtors in managing their affairs on a day-to-day basis.  I submit that, in light of the costs associated with the preparation of employment and retention applications for professionals that would receive relatively small fees and/or who would provide services entirely unrelated to these bankruptcy cases, it is impractical, inefficient, and unnecessarily costly for the Debtors to submit individual applications for each such professional.

149.    I believe it is essential that the employment of the Ordinary Course Professionals, who are already familiar with the Debtors' business and operations, be continued on an ongoing basis, so as to enable the Debtors to conduct their ordinary business affairs without disruption.

Debtors' Motion to Establish Procedures
for Interim Compensation and
Reimbursement of Expenses of Professionals

150.    I believe that Compensation Procedures would reduce the burden imposed on the Court, enable key parties-in-interest to monitor more closely professional fees and costs in these cases, and diminish undue financial burdens on the Professionals.

Dated: July 13, 2009
      Traverse City, Michigan

                                /s/ Barbara E. Lawson
                                Barbara E. Lawson

STATE OF MICHIGAN              )
                                ) ss.:
COUNTY OF GRAND TRAVERSE   )

            SWORN TO AND SUBSCRIBED before me, a Notary Public for the State and

County Aforesaid, on this 13th day of July 2009.

 /s/ Karen L. Leaver
Karen L. Leaver, Notary Public
Commission Expires:  July 15, 2015