# EXHIBIT A

## Huron Agreement




**PROPRIETARY AND CONFIDENTIAL**

June 10, 2009

Mr. William W. Deneau, Chairman
Aurora Oil & Gas Corporation
4110 Copper Ridge Drive, Suite 100
Traverse City, MI 49684

Dear Mr. Deneau:

I am pleased to confirm, on behalf of Huron Consulting Services LLC ("Huron", "we" "us" or "our"), our engagement to provide Aurora Oil & Gas Corporation ("you" or "the Company") certain restructuring management services and certain services related to the role of a Chief Restructuring Officer ("CRO"). This letter agreement and the terms agreed upon herein shall be referred to as "this Agreement."

***Objectives and Scope***

Our objective will be to assist and advise the Company by providing certain restructuring management services, including the services of Sanford Edlein, a Huron Managing Director, who will serve as your Chief Restructuring Officer ("CRO") and a member of your executive management team. Mr. Edlein, in his capacity as the CRO, will report to the restructuring committee (the "Restructuring Committee") of the board of directors (the "Board") of the Company and to the Board, if and as directed by the Restructuring Committee, with close working liaison with the senior management team of the Company as well as legal counsel. In addition to Mr. Edlein, with the consent of the Restructuring Committee or appropriate Company officials or agents, we will provide other Huron professionals to serve as temporary staff ("Temporary Staff") to assist with your restructuring efforts.

We understand the scope and responsibilities of our engagement to include, among other matters:

- Oversight of all financial and operating restructuring activities such as:
  - Financial
    - Review and implementation of cash management system
    - Supervision of vendor payment control
    - Oversight of vendor negotiations
    - Design and development, if needed of forecasting tools including, 13-week rolling and annual cash budgets
    - Review and analysis of cash and budget variances and supervision of forecast revisions
    - Liquidity plan and contingency analysis
    - Flash reporting and dashboard of key indicators
  - Operational
    - Review and analysis of all operational activities, revenue enhancements and expense controls
    - Variation analysis
    - Flash reporting
    - Strategy and capital expenditures needs
    - Implementation of operational and centralization initiatives, if any
    - Review of corporate overhead, personnel and costs





- Evaluation of key management personnel
- Oversight of crisis related SWAT team activities including coordination with legal counsel and accounting as well as working in establishing priorities and resource allocation related to critical summaries and analysis
- Active involvement in the operating activities within the Company to insure that the operating plan is consistent with the restructuring process and that interim and longer term objectives are achieved
- Assessment of core business(es), management, policy, operations, facilities, equipment and operating practices
- Assistance in feasibility analysis in connection with the Company's restructuring efforts including analysis of the sale or refinancing of some or all of the Company's assets or operations
- Interface with all constituencies communicating interim business plans, current performance information and reorganization/restructuring plans
- Meetings and discussions with key operating personnel
- Other such duties and activities as determined by the Board or other appropriate Company officials

Should the Board determine a Chapter 11 filing is the appropriate course to effectuate a restructuring, we will assist the Company and their legal counsel and other professionals as necessary throughout the Chapter 11 cases including, without limitations, addressing first-day matters and issues related to first-day motions; and assisting the Company in the post-petition process and in fulfilling their duties under the Bankruptcy Code, Court orders and any DIP financing agreement. If so requested, we will assist with the preparation of the Company's schedules of assets and liabilities, statements of financial affairs and monthly operating reports.

*Our Services*

Huron may provide additional resources or services related to the scope of the restructuring management services described herein, if agreed upon by the Restructuring Committee or appropriate Company officials. The Company agrees to pay for such additional work under hourly terms of this Agreement.

Huron will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.

Huron will be responsible for the overall management, hiring, and compensation of the Temporary Staff, and the Temporary Staff will not be considered your employees with respect to benefits and other employment matters. Neither Huron nor the Temporary Staff will be entitled to receive from the Company any vacation pay, sick leave, retirement, pension, social security benefits, workers' compensation, disability, unemployment insurance benefits, health or life insurance, and income taxes incurred in connection with the operation of Huron's business.

Huron is prepared to commence this engagement immediately.





*Approach*

We anticipate that the Huron team during the initial phase of this engagement will consist of two or three Temporary Staff in addition to Mr. Edlein.

During the course of the engagement, Huron will adjust the Temporary Staff on an as needed basis (either up or down) with the approval of the Restructuring Committee or appropriate Company officials or agents based upon activities and requirements during the restructuring process.

If any factors arise that are beyond our control that would affect the availability of our staff, such as death, illness, disability, or a career change, we will notify you immediately, and subject to your approval, provided such approval shall not be unreasonably withheld, we will assign a replacement executive with equivalent skills experience and expertise.

*Your Responsibilities*

In connection with our provision of services, you will perform the tasks, furnish the personnel, provide the resources, and undertake the responsibilities specified below.

You agree that within five business days after execution of this Agreement, Sanford Edlein will be appointed by the Board to be the Company's Chief Restructuring Officer effective as of the execution date of this Agreement. A copy of the applicable resolution will be provided to Huron. You agree to provide all Huron personnel acting as officers of the Company the most favorable indemnities provided by the Company to its officers and directors, whether under the Company's by-laws, partnership agreement, by contract or otherwise. This indemnification is in addition to the indemnification afforded Huron under the attached General Business Terms. The Company shall also provide such Huron personnel full coverage under applicable Company insurance policies that protect officers and directors from liability. Certificates of insurance demonstrating the coverage contemplated by the foregoing shall be furnished to us, upon request. Further, you agree to include and cover Mr. Edlein under the Company's directors' and officers' liability insurance to the same extent as the Company's officers.

In the event that other Temporary Staff become officers of the Company, such individuals will be entitled to receive the same indemnification described above with respect to Mr. Edlein.

Except as stated in this Engagement Letter, the risk of loss with respect to the Company's operations and assets shall be borne by the Company. Huron shall not be deemed to have assumed or be liable for any claim, liability, or obligation of the Company whether known or unknown, fixed or contingent accrued or un-accrued. Except as otherwise required by applicable law, any reference to the nature or results of Huron's work may not be communicated to the public through public relations media, news media, sales media, or any other means without the prior written consent of both parties.

In the event the Company files for relief under Chapter 11 of the Bankruptcy Code, (a) the Company agrees to file an appropriate motion prepared in consultation with Huron as to matters relating to our retention by the Company and provision of Services as contemplated hereunder, on the first day of the bankruptcy case or as soon thereafter as is reasonably practicable, which seeks the approval of the assumption of this Agreement by the Company or the retention of Huron as a professional of the





Company, and (b) this Agreement shall be subject to the entry of a final order of the Court approving the assumption of this Agreement or the retention of Huron, as appropriate, in form and substance reasonably acceptable to Huron, and (c) Huron shall not be required to perform any additional services under this Agreement until the entry of the Court's order approving the assumption of this Agreement or authorizing the retention of Huron in accordance with the terms of this Agreement.

*Fees and Expenses*

We will bill on an hourly basis based on the actual hours worked and the following hourly billing rates (which may be subject to adjustment from time to time):

| Title | Hourly Rate |
|---|---|
| Managing Director | $525 |
| Director and Senior Consultant | $450 |
| Manager | $375 |
| Associate | $300 |

Wire transfer to:

Bank of America, N.A.
Chicago, Illinois
Routing No. 0260-0959-3
Account Title: Huron Consulting Services LLC
Account Number: 5800297276
Comments: (Include Invoice Number to ensure proper credit)

We will invoice on a weekly basis and our invoices are due upon receipt. Out-of-pocket expenses (including transportation, lodging, meals, communications, supplies, copying, etc.) will be billed at the actual amounts incurred.

We understand that our bills should be sent to the Company.

*Retainer*

We will require an additional retainer of $50,000 (total to equal $100,000) before we can commence work. The retainer will either be applied as follows:

(1) In the event that you intend to file for bankruptcy protection, immediately prior to the filing of your bankruptcy petition we will apply the retainer to all amounts due to us, provided that, such amount drawn against the retainer may include an estimate for fees and expenses incurred by us but not yet billed prior to the date you intend to file your bankruptcy petition. The precise amount due to us as of your petition date will be determined upon the final recording of all of our time and expense charges. The excess retainer, if any, will be held by us for your application to post-petition fees and expenses that are finally allowed by a bankruptcy court the excess retainer will be refunded to you at the conclusion of the engagement; or





(2) if you do not file a bankruptcy petition, the retainer will either be applied to our final invoice to you at the conclusion of the engagement or will be refunded to you at that time.

*Business Terms*

The attached General Business Terms apply to this engagement.

* * * * * *

Please indicate your agreement with these terms by signing and returning to me the enclosed copy of this letter. This engagement and the enclosed terms will become effective upon our receipt of your signed copy. We appreciate the opportunity to be of service to you and look forward to working with you on this engagement.

Sincerely,

HURON CONSULTING SERVICES LLC

By: ______________________

Attachments: General Business Terms

Acknowledged and Accepted:

AURORA OIL & GAS CORPORATION

By: William W Deneau

Title: C.E.O.

Date: 6-12-09

2226v1

Huron
CONSULTING GROUP

**Attachment to Engagement Letter dated June 10, 2009 between Huron Consulting Group and Aurora Oil & Gas Corporation**

**GENERAL BUSINESS TERMS**

These General Business Terms, together with the Engagement Letter (including any and all attachments, exhibits and schedules) constitute the entire understanding and agreement (the "Agreement") between us with respect to the services and deliverables described in the Engagement Letter. If there is a conflict between these General Business Terms and the terms of the Engagement Letter, these General Business Terms will govern, except to the extent the Engagement Letter explicitly refers to the conflicting term herein.

**1. Our Services and Deliverables** We will provide the services and furnish the deliverables (the "Services") as described in our Engagement Letter and any attachments thereto, as may be modified from time to time by mutual consent.

**2. Independent Contractor** We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our Services. We assume full and sole responsibility for the payment of all compensation and expenses of our employees and for all of their state and federal income tax, unemployment insurance, Social Security, payroll and other applicable employee withholdings.

**3. Fees and Expenses** (a) Our fees and payment terms are set out in our Engagement Letter. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices.)

(b) You acknowledge that where out-of-town personnel are assigned to any project on a long-term basis (as defined from time to time in the applicable provisions of the Internal Revenue Code and related IRS regulations, and currently defined, under IRC Section 162, as a period of time reasonably expected to be greater than one year), the associated compensatory tax costs applied to out-of-town travel and living expenses also shall be calculated on an individual basis, summarized, and assessed to such personnel. In such cases, the expenses for which you shall reimburse us hereunder shall be deemed to include the estimated incremental compensatory tax costs associated with the out-of-town travel and living expenses of our personnel, including tax gross-ups. We shall use reasonable efforts to limit such expenses.

(c) We reserve the right to suspend Services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

**4. Taxes (a)** You will be responsible for and pay all applicable sales, use, excise, value added, services, consumption and other taxes and duties associated with our performance or your receipt of our Services, excluding taxes on our income generally.

(b) If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax.

**5. Confidentiality and Privacy** (a) With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on its subject matter or the circumstances of its disclosure ("Confidential Information"), the other agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed, (v) disclosed pursuant to legal requirement or order, or (vi) disclosed to taxing authorities or to representatives and advisors in connection with tax filings, reports, claims, audits and litigation.

(b) Confidential Information made available hereunder, including copies thereof, shall be returned

Huron
CONSULTING GROUP

or destroyed upon request by the disclosing party; provided that the receiving party may retain other archival copies for recordkeeping or quality assurance purposes and receiving party shall make no unauthorized use of such copies.

(c) We agree to use any personally identifiable information and data you provide us only for the purposes of this engagement and as you direct, and we will not be liable for any third-party claims related to such use. You agree to take necessary actions to ensure that you comply with applicable laws relating to privacy and/or data protection, and we are not providing legal advice on compliance with the privacy and/or data protection laws of any country or jurisdiction.

(d) We may also mention your name and provide a general description of the engagement in our client lists or marketing materials.

6. **Our Deliverables and Your License** Upon full and final payment of all amounts due us in connection with this engagement, all right, title and interest in the deliverables set out in our Engagement Letter will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, knowhow and software ("Huron Property"), including such information as existed prior to the delivery of our Services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of Services for you. To the extent our deliverables to you contain Huron Property, upon full and final payment of all amounts due us in connection with this engagement, we grant you a non-exclusive, non-assignable, royalty-free, perpetual license to use it in connection with the deliverables and the subject of the engagement and for no other or further use without our express, prior written consent. If our deliverables are subject to any third party rights in software or intellectual property, we will notify you of such rights. Our deliverables are to be used solely for the purposes intended by this engagement and may not be disclosed, published or used in whole or in part for any other purpose.

7. **Your Responsibilities.** To the extent applicable, you will cooperate in providing us with office space, equipment, data and access to your personnel as necessary to perform the Services. You shall provide reliable, accurate and complete information necessary for us to adequately perform the Services and will promptly notify us of any material changes in any information previously provided. You acknowledge that we are not responsible for independently verifying the truth or accuracy of any information supplied to us by or on behalf of you.

8. **Our Warranty** We warrant that our Services will be performed with reasonable care in a diligent and competent manner. Our sole obligation will be to correct any non-conformance with this warranty, provided that you give us written notice within 10 days after the Services are performed or delivered. The notice will specify and detail the non-conformance and we will have a reasonable amount of time, based on its severity and complexity, to correct the non-conformance.

We do not warrant and are not responsible for any third party products or services. Your sole and exclusive rights and remedies with respect to any third party products or services are against the third party vendor and not against us.

THIS WARRANTY IS OUR ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLE, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, ALL OF WHICH ARE HEREBY DISCLAIMED.

9. **Liability and Indemnification** (a) This engagement is not intended to shift risk normally borne by you to us. To the fullest extent permitted under applicable law, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities (including reasonable defense costs and legal fees), associated with any legal proceeding or other claim brought against us by a third party, including a subpoena or court order, arising from or relating to any Services that you use or disclose, or this engagement generally. This indemnity shall not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact.

(b) We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event exceed an amount equal to the fees (excluding taxes and expenses) we receive from you for the portion of the engagement giving rise to such liability.

Huron
CONSULTING GROUP

(c) Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

**10. Non-Solicitation** During the term of this engagement, and for a period of one year following its expiration or termination, you will not directly or indirectly solicit, employ or otherwise engage any of our employees (including former employees) or contractors who were involved in the engagement.

**11. Termination**

(a) Termination for Convenience. The Company may terminate this Agreement at any time and for any reason upon providing written notice of termination; we may terminate this Agreement for convenience at any time only upon 30 days' prior written notice to the Company.

(b) Termination for Breach. We may terminate this Agreement for breach if, within 15 days' notice of any material breach, the Company fails to cure such material breach of this Agreement within 15 days.

(c) To the extent the Company terminates this Agreement for convenience, the Company will pay us for all Services rendered, effort expended, expenses incurred, contingent fees (if any), or commitments made by us to the effective date of termination, which shall be the date written notice of termination is provided. To the extent we terminate this Agreement for breach (after providing notice thereof and your failure to cure), the Company will pay us for all Services rendered and reasonable expenses incurred by us to the effective date of the termination, which shall be the date 15 days after written notice of such breach is provided.

(d) The terms of this Agreement, which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations, shall survive its expiration or termination.

(e) The terms of this Agreement which relate to confidentiality, ownership and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.

**12. General** (a) This Agreement supersedes all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by both parties.

**(b) No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.**

(c) We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

(d) This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to conflict of law rules. The parties hereto agree that any and all disputes or claims arising hereunder shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. Any arbitration will be conducted in Chicago, Illinois. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Illinois for purposes of any enforcement of any arbitration award. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

(e) If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.

(f) This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any matter governed by or subject to the provisions of this Agreement.

* * * *