# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AURORA OIL & GAS CORPORATION, | ) | Bankruptcy Case No.: 09-08254 (SWD) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| HUDSON PIPELINE & PROCESSING CO., LLC, | ) | Bankruptcy Case No.: 09-08255 (SWD) |
|  | ) |  |
| Debtor. | ) |  |

## DEBTORS' APPLICATION TO EMPLOY AND RETAIN BEACHWALK CAPITAL LLC

The above-captioned debtors and debtors-in-possession (together, the "Debtors") hereby submit this application (the "Application") for an order, pursuant to Bankruptcy Code §§ 327(a) and 328(a), Bankruptcy Rule 2014, and LBR 2014, authorizing them to employ and to retain Beachwalk Capital LLC ("BC") as their advisor in connection with their restructuring efforts, with such employment and retention effective as of the petition date. In support of this Application, the Debtors rely on the affidavit of Robert Brody (the "Brody Affidavit"), a copy of which is attached hereto as Exhibit A and is incorporated herein by reference, and in further support, they respectfully represent as follows:

### JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory

predicates for the relief requested herein are Bankruptcy Code §§ 327(a) and 328(a), Bankruptcy Rule 2014, and LBR 2014.

## **INTRODUCTION**

2.      On July 12, 2009 (the "Petition Date"), the Debtors filed with this Court separate, voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtors continue to manage their properties and operate their business as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.  No trustee, examiner, or official committee has been appointed in these cases.

The Debtors and their Business[1]

4.      The Debtors, along with certain non-debtor affiliates,[2] operate an independent energy business focused on the exploration and development of natural gas reserves, and they own and operate other businesses that provide supplemental services.

5.      The Debtors own extensive leasehold positions in the Antrim and New Albany shale regions of Michigan, Indiana, and Kentucky, targeting unconventional natural gas projects.  They operate primarily in Michigan, and they also participate in various other projects with joint venture partners, which operate property interests under "joint operating," "farm out," or similar agreements or arrangements, whereby the Debtors receive a percentage of revenue generated from those properties, rather than extracting and selling the natural gas themselves.

---

[1]    The description set forth herein is solely a summary of the Debtors, their corporate structure, their operations, and the events leading to these Chapter 11 cases.  For more information, please review the Debtors' public filings with the SEC, which can be found free of charge at www.sec.gov.

[2]    These following direct or indirect subsidiaries of Aurora are not Debtors in these cases: Aurora Indiana, LLC; Aurora Kentucky, LLC; AOG Michigan, LLC; Aurora Operating, LLC; Celebration Mining Company; Circle Oil, LLC; and Indiana Royalty Trustory, LLC.

The Debtors' corporate headquarters are located in Traverse City, Michigan.

6.    Aurora Oil & Gas Corporation, a Utah Corporation, is the Debtors' main operating company.  Until its recent voluntary delisting, Aurora's outstanding common stock was publicly traded on the American Stock Exchange as "AOG".

7.    Aurora owns approximately 96% of the outstanding membership interests in debtor Hudson Pipeline & Processing, Co., LLC ("HPPC"), and it is HPPC's controlling member.  HPPC, a Michigan limited liability company, provides natural gas transportation and processing services to the Debtors.

8.    The Debtors have 18 full-time employees and one part-time employee.

Capital Structure

9.    On or about August 20, 2007, Aurora entered into an amended and restated credit agreement (as amended and/or modified from time to time, the "First Lien Loan Agreement") with lenders BNP Paribas; Comerica Bank; KeyBank National Association; and CIT Capital USA Inc. (collectively, the "First Lien Lenders").  Obligations under the First Lien Loan Agreement are secured by senior, first-priority liens upon certain of the Debtors' assets (the "Collateral").   As of the Petition Date, approximately $70 million (plus accrued and unpaid interest and other asserted charges) is outstanding under the First Lien Loan Agreement.

10.    At the same time, Aurora entered into a second lien term loan agreement (as amended and modified from time to time, the "Second Lien Loan Agreement") with lenders D.E. Shaw Laminar Portfolios, L.L.C.; BNP Paribas; CIT Capital USA, Inc.; and Energy Components SPC UP-and Midstream Segregated Portfolio (collectively, the "Second Lien Lenders" and together with the Senior Secured Lenders, the "Lenders").  Obligations under the Second Lien Loan Agreement are secured by second-priority liens upon the Collateral and are also guaranteed by HPPC.  As of the Petition Date, approximately $50 million (plus accrued and

unpaid interest) is outstanding under the Second Lien Loan Agreement.

11.    On May 1, 2009, the Debtors and each of the Lenders entered into a Forbearance and Tolling Agreement (as amended on June 12, 2009, the "Forbearance and Tolling Agreement"), whereby the Lenders agreed to forbear from enforcement action with respect to certain events of default and to toll the 90-day avoidance window set forth in Bankruptcy Code § 547 with respect to certain additional collateral granted to the First Lien Lenders in accordance with an earlier amendment to the First Lien Loan Agreement.

12.    On or about September 19, 2005, Aurora entered into a promissory note with Northwestern Bank ("NW Bank"), as secured by a mortgage on Aurora's corporate headquarters in Traverse City (as amended, the "NW Bank Mortgage").  As of the Petition Date, the balance on the NW Bank Mortgage is approximately $2.6 million.

13.    In addition, NW Bank has issued approximately $633,000 in principal amount of letters of credit (collectively, the "NW Bank LCs") that are required for the Debtors' operations in Michigan.  The NW Bank LCs are secured by approximately $160,000 in cash collateral currently in one of Aurora's bank accounts with NW Bank and a pledge of the Debtors' right to receive approximately $500,000.

Circumstances Leading to this Filing

14.    As a result of, among other things, the reduced demand for, and the deflated price of, natural gas, and the initiation of cost-saving measures that temporarily hindered production and increased overhead, the Debtors have failed to satisfy certain production and financial covenants under the First Lien Loan Agreement and the Second Lien Loan Agreement.

15.    The Debtors have worked diligently to facilitate a global restructuring transaction, including entering into several amendments and forbearance agreements with the Lenders.  The Debtors have not yet been able to obtain agreement on the terms of such a

-4-

restructuring and intend to utilize the bankruptcy process to attempt to achieve a consensual restructuring or some other appropriate alternative.

## FACTUAL BACKGROUND[3]

16.    Prior to the commencement of these Chapter 11 cases, the Debtors retained BC to assist them in connection with a potential restructuring of their operations and recapitalization of their funded debt and other obligations and to lead negotiations with the Lenders.  The Debtors hereby seek to continue to employ and to retain BC to perform similar services during these cases pursuant to an engagement letter, dated April 23, 2009 (the "Engagement Letter"),[4] a copy of which is attached hereto as Exhibit B and is incorporated herein by reference.  The Engagement Letter is also submitted for approval herewith.

17.    The Debtors believe that they will require the assistance and expertise of BC during these bankruptcy cases.  The Debtors seek to continue to retain and employ BC because, among other things, BC has extensive knowledge of, and relevant experience in, similar matters.

18.    Prior to the Petition Date, the Debtors engaged BC to provide advice in connection with their attempts to complete a strategic restructuring, reorganization, and/or recapitalization, as well as to prepare for the potential commencement of these Chapter 11 cases. BC has been, and will continue to be, instrumental in negotiating and assisting the Debtors in consummating any restructuring.

---

[3]    The description of the Engagement Letter set forth in this Application is qualified in its entirety by reference to the actual terms of the Engagement Letter.  To the extent of any discrepancy between such description and the Engagement Letter, the terms of the Engagement Letter shall govern.

[4]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Engagement Letter.

19.    In providing pre-petition services to the Debtors in connection with these matters, BC has worked closely with the Debtors' management and other professionals and has become intimately acquainted with the Debtors' operations, debt structure, creditors, business, and related matters.    Accordingly, BC has developed significant relevant experience and expertise with respect to the Debtors that will assist it in providing effective and efficient services in these Chapter 11 cases.

20.    Should the Court approve the Debtors' retention of BC, BC will continue, without interruption, to perform these necessary services on behalf of the Debtors.  In accordance with the Engagement Letter, BC has assisted the Debtors' management and board of directors in connection with analyzing, structuring, and negotiating a potential restructuring, and should alternative strategies need to be explored, BC would continue to be instrumental in advising the Debtors.

<u>Services to be Rendered</u>

21.    As described in greater detail in the Engagement Letter, BC has provided (and subject to approval of this Application, would continue to provide) the following services, among others, for and on behalf of the Debtors:

a.  undertake, in consultation with members of management of the Debtors and its other advisors, a review of a comprehensive business and financial analysis of the Debtors;

b.  to the extent BC deems necessary, appropriate, and feasible, or as the Debtors may request, review, and analyze the Debtors' assets and operating and financial strategies;

c.  review and analyze the business plans and financial projections prepared by the Debtors;

d.  evaluate the Debtors' debt capacity and assist in the determination of an appropriate capital structure for the Debtors;

e.  advise the Debtors on the general state of the "restructuring market";

-6-

     f.   assist the Debtors and their other advisors in determining values or ranges of values (as appropriate) for the Debtors and any securities that the Debtors offer or propose to offer in connection with a Restructuring or a Capital Transaction;

     g.   assist the Debtors and their other advisors in determining and evaluating the risks and benefits of considering, initiating, and consummating any Restructuring, a Capital Transaction, or other transaction;

     h.   be available at the Debtors' request to meet with the Debtors' legal counsel, other employees and advisors, board of directors, creditor groups, and other interested parties; and

     i.   perform such other financial advisory and investment banking services as may be agreed upon by BC and the Debtors.

In the event the Debtors seek to have BC perform any services other than these services, the Debtors would file a supplemental application seeking authorization to retain BC to do so.

22.     Unless otherwise agreed to in writing by BC and the Debtors, the Engagement Letter would extend until the earliest of (a) the effective date of a Chapter 11 plan of reorganization, (b) conversion of these cases, (c) appointment of a Chapter 11 trustee or an examiner with expanded powers, (d) dismissal of these cases, and (e) the consummation of the last Restructuring or Capital Transaction as agreed upon by BC and the Debtors.  The Engagement Letter may be terminated earlier, with or without cause, by BC or by the Debtors upon 15 days' prior written notice.

Professional Compensation, Expenses, and Indemnification

23.     Under the Engagement Letter, the Debtors would pay BC a daily cash fee (the "Daily Fee") of $1,800 for each day of service performed by BC for the benefit of the Debtors.

24.     Additionally, the Engagement Letter provides that concurrently with the consummation of a Successful Transaction, the Debtors would pay BC a fee (the "Applicable Fee") equal to the sum of (a) 1% of the aggregate value received or retained immediately

following completion of a Successful Transaction by common shareholders of the Debtors immediately prior to the Successful Transaction plus (b) .50% of the aggregate net improvement in the Debtors' balance sheet resulting from (i) the Debtors' receipt of net cash proceeds in connection with all Capital Transactions (excluding any such proceeds received in exchange for or relating to the refinancing or replacement of any First Lien Loans) and (ii) the aggregate principal amount of indebtedness cancelled or exchanged or converted into equity or equity-linked securities of the Debtors plus (c) .50% of the aggregate net cash proceeds received as the sale price of all assets sold in any single transaction in excess of $10,000,000. All of the Daily Fees attributable to work performed in connection with BC's efforts in obtaining or effecting the investment from the Specified Capital Transaction Investor would be credited against the Applicable Fee.

25.     If, at any time prior to the expiration of 12 months following the expiration or termination of BC's engagement, a Restructuring or Capital Transaction is consummated, or if the Debtors enter into an agreement regarding a Restructuring or Capital Transaction (which is subsequently consummated), then the Debtors would pay BC the appropriate fee immediately upon the closing of such transaction.

26.     At the election of BC, payment of the Applicable Fee would be made in the form of common equity securities of the surviving or reorganized entity, as applicable, following the consummation of any Successful Transaction, as determined in accordance with the Engagement Letter. If a shareholder vote would be required for payment of the Applicable Fee to be made in the form of common equity securities or for any other reason such payment could not, in the reasonable discretion of the Debtors, be made in the form of common equity securities, the Applicable Fee would be paid in cash.

27.     Furthermore, the Engagement Letter provides that the Debtors would reimburse BC for all reasonable expenses incurred in connection with BC performing services pursuant to the Engagement Letter.  These expenses would generally include travel costs, document reproduction, telephone and facsimile charges, meals, and other customary expenses for this type of transaction.

28.     Finally, in addition to the compensation payable to BC, the Debtors would provide the indemnification found in Annex A to the Engagement Letter, which they believe to be typical for an engagement of this type.

29.     The Debtors believe that the above-described compensation, expense and, indemnification structure is both fair and reasonable in light of the type of services BC proposes to provide.

30.     The Debtors have been advised by BC that it would endeavor to coordinate with the other retained professionals in these bankruptcy cases to eliminate unnecessary duplication or overlap of work.

Disinterestedness of BC

31.     To the best of the Debtors' knowledge, information, and belief, and except as disclosed herein and in the Brody Affidavit, BC has no connection with, and holds no interest adverse to, the Debtors, their creditors, or any other parties-in-interest, or their respective attorneys or accountants, or the United States Trustee or any person employed in the Office of the United States Trustee.

32.     To the best of the Debtors' knowledge, information, and belief, as set forth in the Brody Affidavit, BC is a "disinterested person," as referenced in Bankruptcy Code § 327 and as defined in Bankruptcy Code § 101(14), as modified in Bankruptcy Code § 1107(b).

33.    Accordingly, for the reasons set forth above, the Debtors submit the retention of BC is in their best interests and those of their creditors, their estates, and other parties-in-interest, and therefore, the Debtors desire to employ and to retain BC, with its compensation to be approved upon final (but not interim) application to this Court.

## NOTICE

34.    Notice of this Application has been given via overnight delivery service, e-mail, facsimile, telephone, and/or hand delivery, as appropriate, to the United States Trustee, the 20 largest unsecured non-insider creditors of each of the Debtors, the agent for the First Lien Lenders and its counsel, the agent for the Second Lien Lenders and its counsel, any other known secured creditors, the Securities and Exchange Commission, the United States Attorney's Office for the Western District of Michigan, the United States Attorney General, the Internal Revenue Service, and BC.  The Debtors submit that no further notice of this Application is required.

## NO PRIOR APPLICATION

35.    No previous request for the relief sought herein has been made to this or any other Court.

## <u>CONCLUSION</u>

WHEREFORE, the Debtors request the entry of an order, substantially in the form filed herewith, granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated: Traverse City, Michigan
       July 13, 2009

                              By:    /s/  Sanford Edlein_____
                                     Name: Sanford Edlein
                                     Chief Restructuring Officer
                                     On behalf of the
                                     Debtors and Debtors-in-Possession