## EXHIBIT B

**Engagement Letter**

**EXECUTION COPY**

April 23, 2009

<u>CONFIDENTIAL</u>

Aurora Oil & Gas Corporation
4110 Copper Ridge Drive
Suite 100
Traverse City, MI 49684

Attention: William Deneau

Ladies & Gentlemen:

   1. This letter agreement, which is effective as of March 1, 2009, confirms the arrangements under which Aurora Oil & Gas Corporation (together with its affiliates, the "<u>Company</u>" or "<u>you</u>") has engaged Beachwalk Capital LLC, a New York limited liability company ("<u>Advisor</u>"), to act as its advisor in connection with a Restructuring or a Capital Transaction (each as defined below).

   Advisor will act as advisor to the Company and will advise the Company's board of directors in connection with analyzing, structuring, negotiating and effecting of any potential restructuring of its outstanding indebtedness and any raising of capital in connection therewith. As used herein, the term "<u>Restructuring</u>" shall mean and include: (a) any restructuring, termination, modification, or amendment to the terms, conditions, or covenants of all of the Company's outstanding loans (the "<u>First Lien Loans</u>") under the Amended and Restated Credit Agreement dated August 20, 2007, as amended, among the Company, the guarantors named therein and the agents and lenders from time to time party thereto (including, but not limited to, through a prepackaged, prenegotiated or other plan of reorganization (a "<u>Plan</u>") confirmed in connection with any case or cases commenced by or against the Company or any of its subsidiaries or affiliates, whether individually or on a consolidated basis (a "<u>Bankruptcy Case</u>"), (b) any restructuring, termination, modification, or amendment to the terms, conditions, or covenants of all of the Company's outstanding loans (the "<u>Second Lien Loans</u>" and, together with the First Lien Loans, the "<u>Loans</u>") under the Second Lien Term Loan Agreement dated August 20, 2007, as amended, among the Company, the guarantors named therein and the agents and lenders from time to time party thereto (including, but not limited to, through a Plan), (c) any sale of assets, merger, consolidation or other business combination (including, but not limited to, through a Plan or sale pursuant to Section 363 of the Bankruptcy Code) and (d) any transaction in which the Company prepays or purchases any or all of the Loans, or makes a repurchase offer for any Loans, by any means (including, but not limited to, an exchange offer, a Dutch auction, or through a Plan).

)

As used herein, the term "Capital Transaction" means one or a series of transactions in which the Company issues to one or more investors (any such person or entity, an "Investor") in exchange for cash or assets invested by such Investor (whether effected pursuant to a Plan confirmed in connection with a Bankruptcy Case, outside of a Bankruptcy Case, or otherwise) any (a) secured or unsecured debt (including, without limitation, any asset-backed debt, convertible debt, or debtor-in-possession financing in connection with a Bankruptcy Case); (b) equity interests (including, without limitation, preferred stock or common stock) or equity-linked securities; (c) hybrid capital; or (d) options, warrants or other rights to acquire equity interests in the Company or any of its subsidiaries or affiliates.

The Company shall have the sole right to hire and/or appoint any other employees, agents or advisors in connection with any Restructuring or Capital Transaction.

As part of Advisor's engagement, Advisor will perform the following services, as requested by you:

(a)     undertake, in consultation with members of management of the Company and its other advisors, a review of a comprehensive business and financial analysis of the Company;

(b)     to the extent Advisor deems necessary, appropriate and feasible, or as the Company may request, review and analyze the Company's assets and its operating and financial strategies;

(c)     review and analyze the business plans and financial projections prepared by the Company;

(d)     evaluate the Company's debt capacity and assist in the determination of an appropriate capital structure for the Company;

(e)     advise the Company on the general state of the "restructuring market";

(f)     assist the Company and its other advisors in determining values or ranges of values (as appropriate) for the Company and any securities that the Company offers or proposes to offer in connection with a Restructuring or a Capital Transaction;

(g)     assist the Company and its other advisors in determining and evaluating the risks and benefits of considering, initiating and consummating any Restructuring, a Capital Transaction, or other transaction;

(h)     be available at your request to meet with your legal counsel, other employees and advisors, board of directors, creditor groups and other interested parties; and

(i)     perform such other financial advisory and investment banking services as may be agreed upon by Advisor and the Company.

2.     In connection with Advisor's engagement, the Company will furnish Advisor on a confidential basis with all information that Advisor reasonably deems appropriate

-2-

(collectively, the "Information") and will provide Advisor with reasonable access to the officers, directors, employees, accountants, counsel and other representatives of the Company. To the Company's knowledge, the Information to be furnished by or on behalf of the Company, when delivered, will be true and correct in all material respects and will not contain any material mis-statement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. In addition, the Company agrees to promptly advise Advisor of any ma-terial event or change in the business, affairs or condition (financial or otherwise) of the Com-pany that occurs during the term of Advisor's engagement hereunder. The Company under-stands and agrees that Advisor, in performing its services hereunder, will use and rely upon the Information as well as publicly available information regarding the Company, and that Advisor does not assume responsibility for independent verification of any Information, whether publicly available or otherwise furnished to me, concerning the Company, including, without limitation, any financial information, forecasts or projections, considered by Advisor in connection with the rendering of Advisor services. Accordingly, Advisor shall be entitled to assume and rely upon the accuracy and completeness of all Information and is not required to conduct a physical in-spection of any of the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of the assets or liabilities, of the Company. With respect to any financial fore-casts and projections made available to Advisor by the Company and used by Advisor in its analysis, Advisor shall be entitled to assume that such forecasts and projections have been rea-sonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company as to the matters covered thereby.

       3.    (a) As compensation for its services hereunder, the Company agrees to pay Advisor as follows:

       (1) The Company shall pay promptly as billed to Advisor a daily cash fee of $1,800.00 (the "Daily Fee") for each day of service for which a reasonable amount of work is performed by Advisor for the benefit of the Company, whether or not a Re-structuring or Capital Transaction has taken place or will take place (it being understood that as of March 20, 2009, Advisor was entitled to Daily Fees for three (3) days); and

       (2) concurrently with the consummation of a Successful Transaction (as defined below), the Company shall pay Advisor the Applicable Fee (as defined below).

"Applicable Fee" shall mean an amount equal to the sum, without duplication, of (a) 1% of the aggregate value received or retained immediately following completion of a Successful Transac-tion by common shareholders of the Company immediately prior to the Successful Transaction, plus (b) .50% of the aggregate net improvement in the Company's balance sheet resulting from (i) the Company's receipt of net cash proceeds in connection with all Capital Transactions (ex-cluding any such proceeds received in exchange for or relating to the refinancing or replacement of any First Lien Loans) and (ii) the aggregate principal amount of indebtedness cancelled or ex-changed or converted into equity or equity-linked securities of the Company plus (c) .50% of the aggregate net cash proceeds received as the sale price of all assets sold in any single transaction in excess of $10,000,000. To the extent Advisor is entitled to receive any fees from a third party financing source in connection with such third party providing financing in a Capital Transaction (such party, a "Specified Capital Transaction Investor"), 100% of Advisor's Daily Fees attribut-able to work performed in connection with Advisor's efforts in obtaining or effecting the invest-

-3-

)

ment from the Specified Capital Transaction Investor shall be credited against the Applicable Fees payable pursuant to clause (b)(i) of this definition.

"Successful Transaction" shall mean the successful completion of a Restructuring and/or Capital Transaction; provided, however, that any such Restructuring or Capital Transaction is not effected by a liquidation under Chapter 7 of the Bankruptcy Code.

Payment of the Applicable Fee shall be made in the form of common equity securities of the surviving or reorganized entity, as applicable, following the consummation of any Successful Transaction in an amount calculated on the basis of (x) in the event of a Successful Transaction involving a sale of all of the equity interests or all or substantially all of the assets of the Company, the purchase price paid by the third party purchasers in connection with such sale or (y) otherwise, the daily weighted average sale price of shares of the Company's common equity for the 20 trading days immediately following consummation of a Successful Transaction or, if such information is not available, the fair market value of such securities, as determined by the Company after consultation with Advisor, taking into account any trading restrictions on the securities, the liquidity of any market in which the securities could trade and other relevant considerations; provided that, for the avoidance of doubt, in the event that the Applicable Fee is triggered during a Bankruptcy Case, payment of the Applicable Fee shall only be made in the form of common equity securities of the reorganized Company and not in the form of common equity securities cancelled and/or rendered valueless in connection with a Plan or otherwise; provided further that, if, (i) a shareholder vote would be required for payment of the Applicable Fee to be made in the form of common equity securities or (ii) for any other reason, such payment cannot, in the reasonable discretion of the Company, be made in the form of common equity securities, the Applicable Fee shall be paid in cash.

(b)    In the event the Company requests Advisor to advise it with respect to any transaction that is not a Restructuring or a Capital Transaction, Advisor will be paid customary fees to be mutually agreed upon in writing prior to providing such services.

(c)    Whether or not any Restructuring or Capital Transaction is consummated, and in addition to any fees payable to us, the Company will reimburse us, upon Advisor's written request from time to time, for all reasonable expenses incurred by Advisor in entering into this agreement and in connection with Advisor performing services pursuant to this agreement (including the reasonable fees and expenses of Advisor's counsel), as well as any reasonable fees and expenses of Advisor's counsel incurred in preparing, reviewing, and/or prosecuting any bankruptcy pleadings (including fee applications) with respect to this agreement. These expenses generally include travel costs, document reproduction, telephone and facsimile charges, meals, and other customary expenses for this type of transaction. We agree to provide reasonable backup relating to such expenses to the extent requested by the Company.

(d)    The parties acknowledge that a substantial professional commitment of time and effort will be required of Advisor hereunder, and that such commitment may foreclose other opportunities for us. Moreover, the actual time and commitment required for the engagement may vary substantially. In light of the numerous issues that may arise in engagements such as this, Advisor's commitment to the time and effort necessary to address the issues that will arise in this engagement, the expertise and capabilities of Advisor that will be required in this

-4-

)

engagement, and the market rate for professionals of Advisor's stature and reputation, the parties agree that the fee arrangement provided for herein is just and reasonable, fairly compensates Advisor, and provides the requisite certainty to the Company.

(e)    So long as all fees and expense reimbursements due to Advisor hereunder have been paid in full and in cash before the commencement of a Bankruptcy Case, if the Company files a Bankruptcy Case, Advisor agrees to continue to provide all services reasonably requested by the Company necessary to consummate a Successful Transaction.

4.    (a) In the event that a Bankruptcy Case is commenced, the Company shall use its reasonable best efforts to seek an order of the Bankruptcy Court authorizing the assumption of this agreement under Section 365 of the Bankruptcy Code or such other order of similar effect. In the event the Company is required to retain Advisor as a professional under the Bankruptcy Code, it shall seek to retain Advisor, *nunc pro tunc* to the date of commencement of a Bankruptcy Case, pursuant to Section 328(a) of the Bankruptcy Code and not subject to the standard of review set forth in Section 330 of the Bankruptcy Code. The Company shall file a motion to assume this agreement under Section 365 of the Bankruptcy Code or an application to retain the Advisor under Section 328(a) of the Bankruptcy Code, as applicable, within five days of the date of commencement of a Bankruptcy Case.

(b)    In the event that a Bankruptcy Case is commenced, the Company agrees that Advisor's post-petition compensation as set forth herein and payments made pursuant to the indemnification provisions of this agreement (including, without limitation, *Annex A* hereto) shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

(c)    The Company shall use its reasonable best efforts to ensure that, to the fullest extent permitted by law, any (1) Plan or (2) settlement agreement providing releases to any of the Company's directors or officers contains typical and customary release (both from the Company and from third parties) and exculpation provisions releasing, waiving, and forever discharging Advisor from any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities related to the Company or the engagement described in this agreement.

(d)    The Company agrees not to object to Advisor's requests to the Bankruptcy Court or any appellate court for allowance of fees and expenses earned and/or incurred under this agreement, provided that the fees and expenses so requested comply with the terms and conditions of this agreement.

(e)    The terms of this Section 4 are solely for the benefit of Advisor, and may be waived, in whole or in part, only by Advisor.

5.    The Company understands that if Advisor is asked to act for the Company in any additional capacity relating to this engagement but not specifically addressed in this agreement, then such activities shall constitute separate engagements and the terms of any such additional engagements will be embodied in one or more separate written agreements, containing terms and conditions to be mutually agreed upon, including, without limitation, appropriate in-

-5-

demnification provisions. The indemnity provisions in *Annex A* referred to below shall apply to any such additional engagements, unless superseded by an indemnity provision set forth in a separate agreement applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of Advisor's engagement(s).

      6.      Since Advisor will be acting on behalf of the Company in connection with its engagement hereunder, the Company and Advisor agree to the indemnity provisions and other matters set forth in *Annex A,* which is incorporated by reference into this agreement.

      7.      (a)  Our engagement hereunder shall extend until the earliest of (i) the effective date of a chapter 11 plan of reorganization confirmed in a Bankruptcy Case, (ii) the conversion of a chapter 11 Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, (iii) appointment of a chapter 11 trustee or an examiner with expanded powers in a Bankruptcy Case, (iv) dismissal of a Bankruptcy Case, and (v) the consummation of the last Restructuring or Capital Transaction as agreed upon by Advisor and the Company; provided, however, that Advisor's engagement may be (x) terminated earlier, with or without cause, either by Advisor or by you upon 15 days' prior written notice thereof to the other party, (y) terminated earlier as provided elsewhere herein or (z) extended, in writing, by the Company and us. Notwithstanding the foregoing, in the event of any expiration or termination of Advisor's engagement hereunder, (i) Advisor will continue to be entitled to payment by the Company (or its bankruptcy estate) of the unpaid fees pursuant to Section 3 of this agreement, (ii) unreimbursed expenses incurred by Advisor as a result of services rendered prior to the date of expiration or termination shall become immediately payable by the Company (or its bankruptcy estate) in full, and (iii) (A) the Company's obligation to indemnify Advisor as provided in *Annex A* referred to above and (B) the provisions of Sections 4(b), 4(c), 6, 7, 8, 9, 10, 11, 12, 13, and 14 hereof, shall remain operative and in full force and effect regardless of any such termination or expiration; provided, however, that the provisions of Section 3 hereof shall not survive the termination of this agreement in the event that (x) Advisor terminates such engagement, (y) the Company terminates such engagement as a result of Advisor's bad faith, gross negligence or willful misconduct or (z) despite the Company's reasonable best efforts, the approval of this agreement under Sections 365 or 328 of the Bankruptcy Code, as applicable, or under another provision of similar effect is not authorized by a final non-appealable order of the Bankruptcy Court acceptable to Advisor in its discretion.

      (b)      If, at any time prior to the expiration of 12 months following the expiration or termination of Advisor's engagement hereunder, a Restructuring or Capital Transaction is consummated, or if the Company enters into an agreement regarding a Restructuring or Capital Transaction (which is subsequently consummated), then, except as expressly provided above, the Company (or its bankruptcy estate) shall pay Advisor the appropriate fee specified in Section 3 above immediately upon the closing of such transaction. The Company agrees not to object to Advisor's request for allowance of such fee by the Bankruptcy Court or any appellate court.

      (c)      As a condition to your engagement hereunder, you agree that neither you nor any person or entity directly or indirectly, through one or more intermediaries, controlling you or controlled by you or under common control with you, acting alone or as part of any group, will, for a period of 12 months from the date this agreement is terminated, directly or indirectly, unless specifically requested to do so in writing in advance by the Company:

-6-

      (i)    acquire or agree, offer, seek or propose to acquire, or cause to be acquired, ownership (including, but not limited to, beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) of more than 5% of the assets of the Company or of any securities or indebtedness of the Company, or any rights or options to acquire any such ownership (including from a third party), or

      (ii)    make, or in any way participate in, any "solicitation" of "proxies" (as such terms are used in the Exchange Act) to vote or seek to advise or influence in any manner whatsoever any person with respect to the voting of more than 5% securities of the Company, or

      (iii)    form, join, or in any way participate in a "group" (within the meaning of Section 13(d)(3) of the Exchange Act) with respect to more than 5% voting securities of the Company or any indebtedness of the Company, or

      (iv)    arrange, or in any way participate in, any financing for the purchase of more than 5% voting securities or securities convertible or exchangeable into or exercisable for any voting securities or assets of the Company or any indebtedness of the Company, or

      (v)    otherwise act, whether alone or in concert with others, to seek to propose to the Company or any of its stockholders any tender offer, exchange offer, merger, business combination, restructuring, recapitalization, liquidation or similar transaction involving the Company or otherwise act, whether alone or in concert with others, to seek to control, change or influence the management, board of directors or policies of the Company, or nominate any person as a director of the Company who is not nominated by the then incumbent directors, or propose any matter to be voted upon by the stockholders of the Company, or

      (vi)    solicit, negotiate with, or provide any information to, any person with respect to a tender offer, exchange offer, merger, business combination, restructuring, recapitalization, liquidation or similar transaction involving the Company or any acquisition or disposition of voting securities or indebtedness of or all or any portion of the assets of the Company or any similar transaction, or

      (vii)    announce an intention to do, or enter into any discussions, negotiations, arrangements or understandings with any third party with respect to, any of the foregoing, or

      (viii)    disclose any intention, plan or arrangement inconsistent with the foregoing, or

      (ix)    advise, assist or encourage any other person in connection with any of the foregoing.

      In addition, you also agree during such 12-month period not to (i) request that the Company, directly or indirectly, amend or waive any provision of this Section 7(c) or (ii) take

)

any action that might require the Company to make a public announcement with respect to matters referred to in this Section 7(c). Nothing in this Section 7 shall prevent Advisor from receiving compensation in the form of equity securities pursuant to Section 3 of this agreement or otherwise pursuant hereto.

        8.     Insurance. At its own cost and expense, the Company shall obtain coverage for Advisor and Robert Brody in the amount of at least $2 million under its existing Errors and Omission insurance policy (the "E&O Policy") or shall purchase a new policy with coverage for the Advisor and Robert Brody in the amount of at least $2 million under terms substantially similar to those set forth in the E&O Policy. The Company shall pay the premiums associated with such coverage.

        9.     Confidentiality. Advisor agrees that it and its affiliates, agents, advisors or representative shall use all nonpublic information received by it solely for the purposes of providing the services that are the subject of this agreement and shall treat confidentially all such information; provided, however, that nothing herein shall prevent Advisor and its respective affiliates from disclosing any such information (i) to purchasers or prospective purchasers or lenders in any Restructuring or Capital Transaction (provided that the disclosure of any such information to any purchaser or prospective purchaser or lender shall be made subject to the acknowledgment and acceptance by such purchaser or prospective purchaser or lender that such information is being disseminated on a confidential basis), (ii) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding (in which case Advisor shall give you prompt notice thereof to the extent permitted and shall cooperate with you in securing a protective order in the event of compulsory disclosure), (iii) upon the formal request or demand of any regulatory authority having jurisdiction over Advisor or any of its affiliates (in which case Advisor shall give you prompt notice thereof to the extent permitted and shall cooperate with you in securing a protective order in the event of compulsory disclosure), (iv) to the extent that such information was or becomes publicly available other than by reason of disclosure by Advisor or its affiliates in violation of this agreement or was or becomes available to Advisor or any of its affiliates from a source which, after due inquiry, is not known by Advisor to be subject to a confidentiality obligation to the Company or (v) to the affiliates of Advisor (with Advisor responsible for its affiliates' compliance with this Section) and its and their respective employees, legal counsel, independent auditors and other experts or agents on a confidential and need-to-know basis in connection with any Restructuring or Capital Transaction. These undertakings of Advisor pursuant to this paragraph shall automatically terminate one year following the termination of the engagement of Advisor hereunder.

        10.     The obligations of the Company hereunder shall be the joint and several obligations of the entities comprising the Company. All aspects of the relationship created by this agreement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined exclusively by any New York state or federal court of competent jurisdiction sitting in the Borough of Manhattan in the City of New York to whose jurisdiction Advisor and the Company hereby irrevocably submit. We and the Company hereby irrevocably waive any defense or objection to the New York forum designated above. Notwithstanding the previous two sentences, in the event the Company is or becomes a debtor in a Bankruptcy Case (whether voluntarily or involuntarily), during any

such Bankruptcy Case, actions and proceedings arising out of or relating to this agreement may also be heard and determined by the Bankruptcy Court or any court having appellate jurisdiction over the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings, or if the reference is withdrawn to the United States District Court, then such proceedings shall be heard and determined in any New York state or federal court of competent jurisdiction sitting in the Borough of Manhattan of the City of New York, to whose jurisdiction Advisor and the Company hereby irrevocably submit. Nothing herein shall require a Bankruptcy Case to be filed in the State of New York. WE HEREBY AGREE, AND THE COMPANY HEREBY AGREES ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS SECURITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THE AGREEMENT OR OUR PERFORMANCE THEREUNDER.

11.     This agreement (including all Annexes hereto) embodies the entire agreement and understanding between the parties hereto and supersedes all prior agreements and understandings relating to the subject matter hereof. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void, unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. This agreement may not be amended or otherwise modified or waived except by an instrument in writing signed by both Advisor and the Company. This agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. This agreement shall be binding upon the Company and Advisor and their respective successors and permitted assigns.

12.     The Company acknowledges and agrees that Advisor has been retained to act solely as an advisor to the Company, and not as an agent of the Company or in a fiduciary capacity with respect to the Company or as an advisor of any other person or entity. The Company's engagement of Advisor is not intended to confer rights upon any person (including shareholders, employees or creditors of the Company) not a party hereto as against Advisor.

13.     The parties intend that Advisor shall render services hereunder as an independent contractor, and nothing herein shall be construed to be inconsistent with this relationship or status. Advisor shall not be entitled to any benefits paid by the Company to its employees. Advisor shall be solely responsible for any tax consequences applicable to Advisor by reason of this Agreement and the relationship established hereunder, and the Company shall not be responsible for the payment of any federal, state or local taxes or contributions imposed under any employment insurance, social security, income tax or other tax law or regulation with respect to Advisor and/or Advisor's performance of management services hereunder. Notwithstanding anything in this Agreement to the contrary, the Company shall be entitled to effect any withholding from any amount payable by it pursuant to this Agreement to the extent required by law.

14.     Advisor acknowledges and agrees that Advisor may not assign its obligations and rights under, and Advisor's consideration pursuant to, this Agreement to any other person or entity without the prior written consent of the Company, which may be granted or withheld in the Company's sole discretion.

-9-

*[Signature page follows]*

)

We are delighted to accept this engagement and look forward to working with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to Advisor the enclosed duplicate of this agreement. By affixing your signature hereto, you represent that you are a person authorized by the Company to enter into this agreement on its behalf.

Very truly yours,

BEACHWALK CAPITAL LLC

By: _____

Name:
Title:

Accepted and agreed to
as of the date first written above:

AURORA OIL & GAS CORPORATION

By: _____

Name:
Title:

-11-

)

We are delighted to accept this engagement and look forward to working with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to Advisor the enclosed duplicate of this agreement. By affixing your signature hereto, you represent that you are a person authorized by the Company to enter into this agreement on its behalf.

Very truly yours,

BEACHWALK CAPITAL LLC

By:    _____

Name:
Title:

Accepted and agreed to
as of the date first written above:

AURORA OIL & GAS CORPORATION

By:    _____

Name: William W. Deneau
Title:   Chief Executive Officer

-11-

The provisions of this *Annex A* shall apply to the Engagement referred to in the engagement letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the Engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

AURORA OIL & GAS CORPORATION

By: _____

Name:

Title:

Accepted and agreed to
as of the date hereof:

BEACHWALK CAPITAL, LLC

By: _____

Name:

Title:

-4-

## ANNEX A

April 23, 2009

In further consideration of the agreements contained in the engagement letter dated the date hereof and the engagement described therein (the "Engagement"), in the event that any of Beachwalk Capital LLC, its members, managers, officers, employees, or agents (collectively, the "Indemnified Person") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person (including, without limitation, creditors of Aurora Oil & Gas Corporation (the "Company"), stockholders of the Company, a receiver, a custodian, a trustee or examiner appointed in any case or cases under title 11 of the United States Code commenced by or against the Company or any of its subsidiaries or affiliates, whether individually or on a consolidated basis (a "Bankruptcy Case"), an official committee appointed in a Bankruptcy Case, or a litigation trust, liquidating trust or similar vehicle created in connection with a Bankruptcy Case (or a trustee of such trust or similar vehicle)), in connection with or as a result of the Engagement or any matter referred to in the Engagement, the Company will reimburse the Indemnified Person for its reasonable and customary legal and other expenses (including, without limitation, the costs and expenses incurred in connection with investigating, preparing for and responding to third-party subpoenas or enforcing the Engagement) incurred in connection therewith as such expenses are incurred. The Company will also indemnify and hold harmless the Indemnified Person from and against, and the Company agrees that the Indemnified Person shall not have any liability to any party for, any losses, claims, liabilities, damages and expenses (including actions or proceedings in respect thereof) (collectively, "Losses") (A) related to or arising out of (i) the Company's or its agents' actions or failures to act (including statements or omissions made or information provided by the Company or its agents) or (ii) actions or failures to act by the Indemnified Person with the Company's or its agents' consent or in reliance on the Company's or its agents' actions or failures to act or (B) otherwise related to or arising out of the Engagement or the Indemnified Person's performance thereof, except that this clause (B) shall not apply to any Losses that are finally determined by a court or arbitral tribunal of competent jurisdiction to have resulted primarily from the bad faith, willful misconduct or gross negligence of the Indemnified Person.

If such indemnification for any reason (other than the Indemnified Person's bad faith, willful misconduct or gross negligence as finally determined by a court or arbitral tribunal of competent jurisdiction to have primarily caused the Losses) is not available or is insufficient to hold the Indemnified Person harmless, the Company agrees to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and by us, on the other hand, with respect to the Engagement or, if such allocation is determined by a court or arbitral tribunal of competent jurisdiction to be unavailable, in such proportion as is appropriate to reflect other equitable considerations, such as the relative fault of the Company on the one hand and of the Indemnified Person on the other hand; provided, however, that, to the extent permitted by applicable law, the Indemnified Person shall not be responsible for amounts which, in the aggregate, are in excess of the amount of all fees actually received by the Indemnified Person from the Company in connec-

tion with the Engagement. Relative benefits to the Company, on the one hand, and us, on the other hand, with respect to the Engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company or its security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the Engagement, bears to (ii) all fees actually received by the Indemnified Person in connection with the Engagement.

The Company will not, without the Indemnified Person's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not the Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a complete, unconditional release of the Indemnified Person from any liabilities arising out of such action, claim, suit, investigation or proceeding. The Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of the Indemnified Person, without the Indemnified Person's prior written consent. To the extent seeking indemnification, reimbursement or contribution under this agreement, the Indemnified Person will not, without the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

Prior to entering into any agreement or arrangement with respect to, or effecting, any merger, statutory exchange or other business combination or proposed sale or exchange, dividend or other distribution or liquidation of all or a significant portion of its assets in one or a series of transactions or any significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth herein, the Company will notify the Indemnified Person in writing thereof (if not previously so notified) and, if requested by us, shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth herein, including the assumption of such obligations by another party, insurance, surety bonds or the creation of an escrow, in each case in an amount and upon terms and conditions satisfactory to us.

The Company's obligations hereunder shall be in addition to any rights that the Indemnified Person may have at common law or otherwise.

The Company acknowledges that in connection with the Engagement Advisor is acting as an independent contractor and not in any other capacity, with duties owing solely to the Company. This agreement and any other agreements relating to the Engagement shall be governed by and construed in accordance with the laws of the State of New York, applicable to contracts made and to be performed therein. All actions and proceedings arising out of or relating to this agreement shall be heard and determined by any New York State or federal court of competent jurisdiction sitting in the Borough of Manhattan in the City of New York to whose jurisdiction Advisor and the Company irrevocably submit. Notwithstanding the foregoing, solely in the event a Bankruptcy Case is commenced with respect to the Company, all actions and proceedings arising out of or relating to this agreement shall be heard and determined by the Bankruptcy Court. If the Bankruptcy Court declines to assert jurisdiction over such proceedings, or if the reference is withdrawn to the United States District Court, then such proceedings shall be heard

-2-

and determined in any New York state or federal court of competent jurisdiction sitting in the Borough of Manhattan of the City of New York, to whose jurisdiction Advisor and the Company hereby irrevocably submit. Solely for purposes of enforcing the Company's obligations hereunder, the Company consents to personal jurisdiction, service and venue in any court proceeding in which any claim subject to this agreement is brought by or against the Indemnified Person. ADVISOR HEREBY AGREES, AND THE COMPANY HEREBY AGREES, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTERCLAIM OR ACTION ARISING OUT OF THIS AGREEMENT.

The provisions of this **Annex A** shall apply to the Engagement referred to in the engagement letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the Engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

AURORA OIL & GAS CORPORATION

By: _____

Name:
Title:

Accepted and agreed to
as of the date hereof:

BEACHWALK CAPITAL LLC

By: _____

Name:
Title:

-4-

The provisions of this *Annex A* shall apply to the Engagement referred to in the engagement letter dated the date hereof (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the Engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable, or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

AURORA OIL & GAS CORPORATION

By:  _William W. Deneau_

Name: William W. Deneau
Title:   Chief Executive Officer

Accepted and agreed to
as of the date hereof:

BEACHWALK CAPITAL LLC

By:  _____

Name:
Title:

-4-

We are delighted to accept this engagement and look forward to working with you on this assignment. Please confirm that the foregoing is in accordance with your understanding by signing and returning to Advisor the enclosed duplicate of this agreement. By affixing your signature hereto, you represent that you are a person authorized by the Company to enter into this agreement on its behalf.

Very truly yours,

BEACHWALK CAPITAL LLC

By: _____
Name: _____
Title: _____

Accepted and agreed to
as of the date first written above:

AURORA OIL & GAS CORPORATION

By: _____
    Name:
    Title:

-11-